

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-76,140

**RAYMOND DELEON MARTINEZ, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### FROM CAUSE NO. 387158 IN THE 184TH DISTRICT COURT
### HARRIS COUNTY

**HOLCOMB, J., delivered the opinion of the Court, in which KELLER, P.J., and PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., joined. MEYERS, J., dissented.**

Appellant was convicted of capital murder in October 1989 for an offense committed in July 1983.[1] TEX. PENAL CODE ANN. §19.03(a)(2). Pursuant to the jury's answers to the

---

[1] Appellant had previously been convicted of this offense and sentenced to death in 1984, but that conviction and sentence were overturned on direct appeal based on jury-selection error. *Martinez v. State*, 763 S.W.2d 413 (Tex. Crim. App. 1988).

statutory punishment issues, the trial court sentenced appellant to death. Art. 37.071 §2(e).[2] This conviction and sentence were affirmed on direct appeal. *Martinez v. State*, 867 S.W.2d 30 (Tex. Crim. App. 1993). In September 2007, this Court granted habeas corpus relief, set aside appellant's death sentence, and remanded the case to the trial court for a new punishment hearing. *Ex parte Martinez*, 233 S.W.3d 319 (Tex. Crim. App. 2007) (granting a new punishment hearing because the jury did not have a vehicle through which to give meaningful consideration to appellant's constitutionally relevant mitigating evidence).

In 2009, the trial court held a new punishment hearing before a new jury. Based on the jury's answers to the special issues set forth in Article 37.0711, sections 3(b) and 3(e), the trial court sentenced appellant to death. Art. 37.0711 §3(g). Direct appeal to this Court is automatic. Art. 37.0711 §3(j). After reviewing appellant's seven points of error, we find them to be without merit. Consequently, we affirm the trial court's sentence of death.

## STATEMENT OF FACTS

On July 11, 1983, appellant and Antonio Riojas entered the Long Branch Saloon in Houston to "case" the establishment. The men each ordered a beer, sat at one end of the horseshoe bar, and then took a drink while looking around. They then left without finishing their beers. The next evening, the men returned to the Long Branch Saloon, ordered beers,

---

[2] Unless otherwise indicated all future references to Articles refer to Code of Criminal Procedure.

and took a drink. They asked the bartender, Rose Hardman,[3] to point out the manager. When Hardman pointed to Herman Chavis, the men left.

On July 13, the men were joined by Jackie Kirtley and once again went to the Long Branch Saloon. They ordered beer and took a drink. This time, however, they did not leave. Riojas "backed up to the [front] door" and locked it. He then drew a gun and pointed it at some patrons. Kirtley went to the "back" of the saloon, near the pool tables, and fumbled with a storage-room door. Appellant went behind the bar and told Hardman to give him the money from the register. Appellant told her that he wasn't "playing" and pushed her toward the register while pressing a gun to her ribs.

Meanwhile, Kirtley ordered a patron to "get on the floor." When the patron didn't respond immediately, Kirtley picked up a pool cue and swung it at the patron. Chavis, who was nearby, intervened and grabbed Kirtley in a bear hug to prevent him from hitting the patron with the pool cue. The scuffle caught appellant's attention. He pushed Hardman to the floor, stepped up onto an ice chest cooler, took aim, and shot Chavis multiple times, at the same time injuring Kirtley in the chest and shoulder. Chavis died from the gunshot wounds.

Appellant, Riojas, and Kirtley fled the saloon without obtaining any cash from the register. Appellant told Mary Lou Garcia Salazar, who was waiting in the getaway car, that

---

[3] The bartender's proper name, as indicated in the record, is Rosalie Hardman Blalock. She is identified throughout the record as Rose, Rosie, and Rosalie and by the surnames Hardman and Blalock. She is identified as Rose Hardman in this opinion.

he "had to unload his whole – the whole – his whole gun" when he shot Chavis. Appellant gave Kirtley $40 and dropped him off at a friend's house with the understanding that Kirtley would tell anyone who asked that he had been walking down the street and had been shot by "some guy." According to Salazar, appellant displayed no remorse.

## FUTURE DANGEROUSNESS

In his first and second points of error, appellant challenges the legal and factual sufficiency of the evidence supporting the jury's future dangerousness determination. Art. 37.0711 §3(b)(2). This Court has consistently declined to conduct a factual-sufficiency review in this context, and appellant's arguments do not persuade us to retreat from these holdings. *Renteria v. State*, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006); *Russeau v. State*, 171 S.W.3d 871, 878 n.1 (Tex. Crim. App. 2005). More importantly, appellant's factual-sufficiency point of error is ultimately premised on our decision in *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996), in which we established "the proper standard of review for factual sufficiency of the elements of the offense," and we overruled *Clewis* in *Brooks v. State*, No. PD-0210-09, ___S.W.3d___ (Tex. Crim. App.–Oct. 6, 2010). We therefore overrule point of error two.

Appellant challenges the legal sufficiency of the evidence supporting the jury's determination regarding the future dangerousness issue, particularly in light of his advanced age and his twenty-nine years of "unremarkable time in prison" society during which he exhibited only "relatively minor bad behavior."

A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Wardrip v. State*, 56 S.W.3d 588, 594 & n.7 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). Contrary to appellant's argument that this Court must "look for all the *Keeton* factors,"[4] this Court has previously held that the facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness. *Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995); *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986). We must view all of the evidence in the light most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future dangerousness issue was "yes." *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

In addition to the facts of this offense, the sentencing jury heard testimony regarding appellant's criminal history, gang affiliation, and behavior in prison. The jury heard that appellant was difficult to control as a child, and he was not interested in working with his

---

[4] The *Keeton* factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the crime; (7) psychiatric evidence; and (8) character evidence. *Keeton*, 724 S.W.2d at 61.

family. As his father described, when the family would pick cotton in the fields, appellant would go fishing rather than help.

Appellant's lengthy history with the criminal justice system began at the age of fifteen when he was adjudicated delinquent and committed to one and one-half years detention in Gatesville State School for Boys ("Gatesville") for statutory rape. Within just a few months of his release, appellant was adjudicated delinquent for theft and returned to Gatesville to serve seven months more. While in Gatesville, appellant tried to enlist his brother's help to escape and did attempt to escape. Within a month of his release from the juvenile system at the age of eighteen, appellant committed burglary. He was sentenced to two years of imprisonment in the Texas Department of Corrections ("TDC").[5]

In 1965, appellant attempted to escape from the Brown County jail while awaiting transfer to TDC. Following his release, he committed burglary and was found not guilty by reason of insanity. He was committed to Rusk State Hospital in May 1967. His sanity was deemed restored and he was released on June 30, 1969. Appellant went on to commit four robberies, two of which were armed, and theft of an automobile. He also escaped from jail. Upon his conviction for these offenses in August and September 1969, he was sentenced to twenty years of imprisonment for each of the robberies, five years for escape, and two years for theft.

---

[5] In 1989, the Texas Department of Criminal Justice ("TDCJ") was formed and absorbed TDC.

The jury learned that, during this period of incarceration, appellant became an organizer and leader of the Texas Syndicate prison gang. The jury learned from a forensic neuropsychiatric evaluation, Defense Exhibit number 33, that appellant "killed those who opposed the formation of the [prison gang]." He was "chronically violent, physically and verbally, and would attack others with little provocation." Appellant stabbed an inmate in April 1975, and two others in September 1976. In April 1978, he created a weapon constructed of a "7-inch steel rod sharpened to a point" and stabbed another inmate. "Intoxicating inhalants" were discovered in his cell, and guards found him "huffing." Marijuana was found concealed under the mattress in appellant's cell in October 1981. Appellant was paroled in December 1982.

After his release to parole, appellant lived primarily in Fort Worth with his sister Julia Martinez Gonzales and her daughter, Laura Escoto. He warned his niece that she should be afraid of him, and he gave her and his nephew loaded guns to play with on at least one occasion. When admonished for this by Gonzales, appellant was unconcerned and laughed. He occasionally stayed with his sister Raquel DeLaCruz and her husband. Appellant bragged to DeLaCruz and his brother Johnny DeAnda[6] that he had stabbed an inmate in prison and had committed more than seventeen robberies in the Fort Worth area. He explained to DeAnda that he would lure a club-goer outside with him and then knock out and rob the

---

[6] The State refers to DeAnda as Juan DeAnda in its brief. Because DeAnda identified himself as Johnny in his former testimony, he is referred to as Johnny in this opinion.

person. Appellant told DeLaCruz that he was a leader in the Texas Syndicate. He also stole her car and held a gun to her head on separate occasions.

Appellant's father attempted to help him find a job, but appellant was not interested in work. Instead, he wanted to establish a methamphetamine lab or grow marijuana to generate funds for the Texas Syndicate. To begin this project, appellant obtained between ten and fifteen thousand dollars and went to California to purchase the chemicals necessary to "cook" methamphetamine. Once he obtained the chemicals, appellant shot the man who delivered them. He disposed of the man's body, kept the money, and returned to Texas.

In early 1983, appellant checked himself into a mental hospital after he was no longer welcome in his family members' homes. He intended to "stall for time" and to wait for Kirtley to be released from prison. However, he was discharged from the hospital just a few months later when he assaulted someone. He then joined up with Riojas. In May 1983, appellant met Salazar, who was a teenage runaway. Salazar learned that appellant and Riojas were members of the Texas Syndicate. Appellant attempted to recruit Salazar to join the gang. He controlled where she could go and what she could do, to the point of forcing her to prostitute herself on at least two occasions.

On July 11, 1983, appellant began a crime spree that resulted in the deaths of five people, including the victim in this case. That day, Riojas "cased" the Don Ramon Lounge, and both appellant and Riojas "cased" the Long Branch Saloon. That night, the two men, accompanied by Mary Guerra, returned to the Don Ramon Lounge, where they ordered beer

and sat in a booth. They then pulled out their guns and ordered everyone to the floor. Guerra stood watch by the front door while appellant took money from the cash register. Appellant then ordered many of the customers into the restroom. At some point, he began shooting. Moses Mendez was shot and killed.[7] Appellant, Riojas, and Guerra fled to a waiting car.

Early in the evening on July 12, 1983, appellant and Riojas again "cased" the Long Branch Saloon. Around 9:00 p.m. that night, they entered Elaine's Lounge. Appellant vaulted over the bar, pointed his gun at the bartender, and demanded that she open the cash register. During the robbery at Elaine's Lounge, witnesses recognized that appellant was "definitely in charge." Appellant terrorized patrons, pistol-whipping one and threatening another that he would "blow [his] fucking brains out." He took money and jewelry from the patrons and then ordered them into the men's restroom. Appellant warned them before leaving that "if any one of you sticks your head out this door in the next five minutes, you will be blown to hell."

The following night, appellant and Riojas were joined by Kirtley and executed their plan to rob the Long Branch Saloon as described in the statement of facts. After the murder at the Long Branch Saloon, appellant, Riojas, and Salazar left Houston. They drove to Fort Worth where they stayed with appellant's sister, Gonzales, and her daughter, Escoto. Gonzales introduced appellant to her boyfriend Guillermo "Willie" Chavez.

---

[7] The record in this case does not affirmatively establish who shot Mendez.

On July 15, 1983, after dropping Escoto off at a skating rink, appellant, Gonzales, Riojas, and Salazar met Chavez at a night club where appellant and Chavez had a disagreement. Later, while driving to another night club in the Fort Worth area, appellant argued with Gonzales about his dislike of her boyfriend. Appellant told Gonzales that he had decided that he was going to kill Chavez. Gonzales told appellant, "[I]f you're going to kill him, you have to kill me first." Appellant pulled the car onto a darkened street. He and Gonzales got out of the car and continued to argue while Riojas physically restrained Chavez in the car. The argument ended with appellant shooting Gonzales and leaving her to die on the side of the street. Appellant returned to the car where he shot Chavez seven times. Chavez's body fell out of the passenger side of the car. Appellant directed Salazar to take Chavez's wallet, but she refused. Appellant, Riojas, and Salazar returned to Gonzales' home, where appellant went through her things and ransacked the apartment. Escoto, who had received a ride home from a friend, saw her uncle climbing out of the apartment window. Appellant, Riojas, and Salazar drove south to Waco, where they split up.

Several days later, the group reunited at the Big State Motel in Houston where appellant was introduced to Traci Pelkey. Appellant announced to the others that Pelkey was "his girl." On July 21, 1983, the group decided to leave the motel, but Pelkey wished to stay behind. As the group began to drive away, appellant got out of the truck and went back around the corner of the motel to where Pelkey had remained. Appellant and Pelkey argued

as they "came back around" to the truck. Appellant hit Pelkey over the head with his gun and shot her three times in the chest.

Appellant drove away with Riojas and Salazar, leaving Pelkey to die on the side of the road. When Riojas asked him, "Why the hell did you do that for?" appellant responded, "This chick was trying to get slick with me. So I killed her." The group hid out at Riojas' home where they were discovered and arrested on July 23, 1983.

Appellant has been in custody since his 1983 arrest. According to Texas Department of Criminal Justice ("TDCJ") records, appellant accumulated 34 documented disciplinary incidents between 1986 and 2005.[8] Four of the incidents were classified as minor, and thirty were classified as major. Sixteen of the major incidents were assaults on correctional officers, many for spitting or chunking.[9] Two others were assaults on inmates. Cay Cannon, a member of the TDCJ State Classification Committee, related that appellant is a confirmed gang member.

Despite appellant's assertion that he has exhibited only "relatively minor bad behavior," the descriptions of a sampling of his disciplinary infractions, which occurred while appellant was in a single cell apart from the general population, are not minor. In

---

[8] Not all of appellant's disciplinary incidents during that period of time occurred while he was in the custody of TDCJ. Disciplinary infractions that occurred while he was in the custody of county corrections officials are not included on that list of 34 incidents unless reported to TDCJ by county authorities.

[9] "Chunking" is causing another person to contact the blood, seminal fluid, vaginal fluid, saliva, urine, or feces of the actor, any other person, or an animal.

February 2002, during a hostage situation in which a female guard was held by armed inmates, appellant had a full view of the situation from his cell. He encouraged the other inmates to kill the guard by shouting, "Kill that bitch! Kill that bitch!" He also interfered with the ability of other guards to ensure the hostage's safe release.

In June 2002, appellant made a homemade spear and threw it at another inmate, narrowly missing a correctional officer. In September of the same year, appellant was caught masturbating in a public area and refused to stop when ordered to do so by a correctional officer. In August 2004, a correctional officer discovered contraband in appellant's cell during a standard search. The contraband was minor, but appellant's reaction was not. Appellant spat into the face and mouth of the officer and then cursed and threatened the officer with physical violence. Appellant's reaction was "total rage and aggression."

In April 2005, appellant wanted punch rather than tea with his meal. He got "mad about it . . . started screaming" and spat in a correctional officer's face. That same month, appellant spat in the face of another correctional officer while being escorted back to his cell from the infirmary after being told that he could not see a doctor immediately.

In January 2008, while housed in the "most secure" pod of the Harris County Jail, appellant managed to unlock his cell door and attack another inmate who had previously thrown feces into appellant's cell. Appellant "won" the fight against the other inmate, who was described as strong and "well-built" and was 40 years younger than appellant.

Correctional officers with many years of experience described appellant as significantly more dangerous than other inmates.

Appellant's poor behavior was not reserved for correctional officers and other inmates. In the spring of 2004, Laura Escoto visited appellant in prison to gain closure regarding her mother's murder. Appellant told Escoto that "he was sorry that he killed [her] mom, but she got in the way." Escoto related that appellant seemed neither sincere nor remorseful. Escoto believed that appellant wanted to continue a relationship with her so that she would buy him things and help him publish a book about his life.

Appellant bragged to Escoto that he had committed 20 assaults against guards and had raped other inmates at knife point. He told her that he wanted to kill more people. When appellant was upset with his sister, DeLaCruz, he told Escoto that he "had killed the wrong sister." Appellant also bragged about his health and physical condition, telling Escoto that even though he was in his sixties, he still did two hundred situps and pushups each day. According to Escoto, appellant was never remorseful for things he had done and referred to himself as a "psychopath."

When Escoto decided that she was not interested in corresponding with or visiting appellant any longer, appellant began threatening her. Appellant reminded Escoto that prior to his incarceration, he had found a previous boyfriend of her mother's and "beat the shit out of him" because he believed the boyfriend had treated Escoto badly. Appellant claimed that if he had been armed when he found the man, he would have killed him. Appellant also told

Escoto that she didn't know who he was or what he belonged to. He reminded her that he was a part of the Texas Syndicate and threatened that he had "people on the outside" who would "take care" of her and her family if he wanted.

In 2008, while appellant was in the Harris County Jail awaiting his new punishment hearing, he wrote several letters to members of his family. In one, he wrote that he had killed his sister when "she grabbed [his] arm to stop" him from killing Chavez. He closed the letter by writing that he "shot [Chavez] twice in the head. Guess that will be all." In others, he bragged about the fight he had in the Harris County Jail with a "big black young dude." He related that he was able to "jam [his] door" and open it. He wrote that he beat the other inmate because the other inmate "had been disrespecting" him. Appellant was proud that he was able to physically defeat someone much younger than himself.

Appellant celebrated his sixty-fourth birthday in July 2010. He presented the jury with information about "aging out," a term that describes the general inverse relationship of criminality and violence to age, and now argues that his incidents of criminality have decreased as he has aged, and that if given a life sentence, that he will never be paroled and will die in prison. Appellant's own disciplinary history belies his argument that he has "aged out." Moreover, appellant's age was only one of the many factors jurors were allowed to consider in determining whether he would be a continuing threat to society. *Keeton*, 724 S.W.2d at 61.

Appellant also relies on this Court's decision in *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007), to support his argument that he would not pose a continuing threat to society within prison. We understand appellant to argue that *Berry* should be read to require the jury to consider, within its future dangerousness determination, whether a capital defendant sentenced to life imprisonment would be a continuing threat to prison society. This Court has previously interpreted the future dangerousness special issue to ask whether a defendant would be a continuing threat "whether in or out of prison" without regard to how long the defendant would actually spend in prison if sentenced to life. *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010) (quoting *Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007)); *see also Braxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995) (adopting the reasoning of the plurality opinion in *Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995) (plurality op.), which stated that the term "society" includes both the prison and non-prison populations). Appellant's reasoning does not persuade us that our interpretation of "society" is in error.

Further, *Berry* is distinguishable from this case. In *Berry*, this Court decided that the evidence was legally insufficient to support an affirmative answer to the future dangerousness special issue because the evidence showed that the defendant was dangerous to only some, but not all, of her own newborn children, which she would not likely have during her child-bearing years in prison. *Berry*, 233 S.W.3d at 863-64. Therefore, a jury could not rationally find that the defendant was a future danger. *Id*. The evidence in this

case, however, supports a finding that appellant is dangerous to a broad range of potential victims both inside and outside of prison.

The jury had before it evidence of appellant's extensive criminal history as well as evidence of his continued disciplinary problems during his incarceration. The jury further heard testimony about appellant's continued lack of remorse as well as his violence and threats against his own family. Having viewed all of the evidence in the light most favorable to the jury's finding, we determine, based on that evidence and reasonable inferences therefrom, that a rational jury could have found beyond a reasonable doubt a probability that appellant would pose a continuing threat to society. Point of error one is overruled.

## DELIBERATENESS

In point of error three, appellant claims the evidence is factually insufficient to support the jury's affirmative answer to the deliberateness special issue, "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Art. 37.0711 §3(b)(1). Appellant's point of error is premised on our decisions in *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), and *Wardrip v. State*, 56 S.W.3d 588 (Tex. Crim. App. 2001). In *Clewis*, we established "the proper standard of review for factual sufficiency of the elements of the offense." *Clewis v. State*, 922 S.W.2d at 129. In *Wardrip*, we held that "the deliberateness special issue may be reviewed for factual sufficiency using the *Clewis* standard." *Wardrip v. State*, 56 S.W.3d at 591. However, in *Brooks v. State*, No. PD-0210-

09, ___S.W.3d___ (Tex. Crim. App.–Oct. 6, 2010), we overruled *Clewis* and, in effect, overruled the *Wardrip* factual-sufficiency holding as well. We therefore overrule point of error three.

## EXTRANEOUS OFFENSE

In point of error four, appellant complains that the trial court committed reversible error by admitting testimony regarding an unadjudicated extraneous offense, an "alleged threat against the unborn child of a witness," over objection.

Linda Burch testified in the 2009 punishment hearing that she was "obviously pregnant" when she testified against appellant during his 1984 trial. Over appellant's objections of relevancy and prejudice, Burch testified that when she finished giving her 1984 testimony and was walking away from the witness stand, she passed by appellant who looked at her and asked, "Do you ever think you're going to have that one alive?" Burch interpreted this statement as a threat against the life of her unborn child. She testified that she left the courtroom crying but did not tell anyone other than her husband about appellant's remark until speaking with the prosecutor prior to the 2009 punishment hearing. The prosecutor immediately notified the defense of its intent to offer the evidence.[10]

We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the

---

[10] We note that, in the summary of his argument regarding this point of error, appellant mentions that the extraneous offense evidence was admitted "with no adequate notice." Appellant did not object to lack of notice during trial and does not expand this statement in his brief. Therefore, we do not address the issue of notice. *See* TEX. R. APP. 33.1 & 38.1.

danger of unfair prejudice, under an abuse of discretion standard. *Green v. State*, 934 S.W.2d 92, 104 (Tex. Crim. App. 1996). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id*.

Article 37.0711, section 3(a), permits a trial court during the punishment stage of a capital murder trial to admit evidence "as to any matter that the court deems relevant to sentence." Generally, evidence of extraneous bad acts committed by the defendant is relevant and admissible at the punishment stage of a capital murder trial, so long as the State "clearly proves" that the misconduct occurred and that the defendant was the perpetrator. *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009). Burch's testimony under oath that appellant made the statement to her was sufficient to "clearly prove" that the misconduct occurred and that appellant was the perpetrator.

Relevant evidence is that which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. TEX. R. EVID. 401. We have held that future dangerousness is an issue relevant to the punishment phase of a capital murder trial. *Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995). Burch's testimony was relevant to the jury's determination of appellant's future dangerousness under Rule 401 because it had a tendency to make the existence of appellant's future dangerousness more probable than it would be without the evidence. *See Garcia v. State*, 887 S.W.2d 862, 879 n.19 (Tex. Crim. App. 1994) (noting that the defendant's threat

to kill a witness was "admissible at punishment as substantive evidence of future dangerousness").

Appellant further contends that, even if relevant, the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Appellant characterizes the evidence as having "relatively low probative value and . . . extremely high prejudicial effect." He goes on to state that the "permissible probative value of the [statement] was virtually, if not entirely[,] absent." (Emphasis in original).

Texas Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

"Rule 403 favors the admission of relevant evidence, and carries a presumption that relevant evidence will be more probative than prejudicial." *Young*, 283 S.W.3d at 876.

We disagree with appellant that his statement to Burch had no probative value. That appellant would make such a statement to an obviously pregnant woman regarding an unborn child is some evidence of his character. Appellant asserts that, because the statement is evidence of his character, it should have been excluded. Evidence of a defendant's character, however, is one of the factors that a jury may consider in its future dangerousness determination. *Keeton*, 724 S.W.2d at 61.

Furthermore, Rule 403 does not require exclusion of evidence simply because it creates prejudice; the prejudice must be "unfair." *State v. Mechler*, 153 S.W.3d 435, 440

(Tex. Crim. App. 2005). The danger of unfair prejudice exists only when the evidence has the "potential to impress the jury in an irrational way." *Id*. at 440-41. That was not the case here. Although the State elicited the information from Burch, it was never mentioned again and was not relied upon by the State during its closing argument. The trial court did not abuse its discretion in admitting the evidence regarding appellant's statement to Burch. Point of error four is overruled.

## RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES

In point of error five, appellant alleges that the trial court violated his Sixth Amendment right to confront and cross-examine a witness by allowing Johnny DeAnda's 1989 testimony to be read into evidence.

Prior to the presentation of evidence, the State made the trial court aware that it intended to present the testimony of former witness DeAnda by reading it into the record because DeAnda had passed away. At that time, appellant indicated agreement with the use of the transcript. Later, however, appellant filed a motion objecting to the use of the transcript. Appellant argued that he was limited in his cross-examination because during the previous trial, appellant's former attorney had "fail[ed] to thoroughly and fully go into mitigating evidence and facts and circumstances regarding [appellant]." We interpret this language to mean appellant objected that his prior counsel did not have a similar motive for

cross-examining DeAnda at the previous trial. *See* TEX. R. EVID. 804(b)(1).[11] The trial court overruled appellant's objection, and on the day before closing arguments, appellant filed a second motion objecting to the use of the testimony pursuant "to the [United States] Constitution 6, 8, 14th, and 16th Amendments to the [C]onstitution and pursuant to *U.S. v. Crawford* and its progeny."[12]

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause bars out-of-court testimonial statements by a witness unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The United States Supreme Court has not provided a comprehensive definition of testimonial statements, but it has stated that the term applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial." *Id*.

---

[11] Texas Rule of Evidence 804(b)(1) provides that "[i]n criminal cases, testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by . . . cross[-]examination" is not excluded as hearsay if the witness is unavailable.

[12] The Court notes that appellant's second motion, as it appears in the record, is handwritten. The Court understands the motion to object pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny, as well as pursuant to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Appellant's objection pursuant to the Sixteenth Amendment, which allows Congress to levy and collect taxes, is inapposite and will not be addressed.

The record shows that DeAnda was "unavailable" as a witness because he died after testifying in 1989. DeAnda's testimony during appellant's 1989 trial constituted "testimony given as a witness at another hearing." Finally, the record shows that appellant's attorneys did cross-examine DeAnda during the 1989 trial. Therefore, under the plain language of *Crawford*, DeAnda's former testimony was constitutionally admissible during appellant's 2009 punishment hearing.

Appellant, however, appears to additionally argue that the "similar motive" requirement in Texas Rule of Evidence 804(b)(1) is coextensive with the requirements of the Confrontation Clause and should have prevented the admission of DeAnda's testimony in this case. Specifically, he argues that because the punishment charge to the jury in 1989 did not contain a separate mitigation instruction, appellant did not have the same motivation to cross-examine DeAnda regarding mitigation as he did in 2009, when the jury charge contained a separate mitigation instruction. Appellant asserts that he did not have the same focus in 1989 and, therefore, did not subject DeAnda to the same depth and breadth of cross-examination regarding mitigation as he would have in the 2009 hearing. Assuming, as we did in a prior unpublished opinion, that the "similar motive" requirement found in the rules of evidence is also required by the Confrontation Clause, we address appellant's claim. *See Broxton v. State*, No. AP-71,488 (Tex. Crim. App. June 29, 2005) (not designated for publication), 2005 Tex. Crim. App. Unpub. LEXIS 393, at *20.

As a general rule, when the parties, the charge, and the issues to be litigated are the same in the first and second trials, the two proceedings are necessarily the same and former testimony is admissible. *Bryan v. State*, 837 S.W.2d 637, 644 (Tex. Crim. App. 1992). However, as appellant points out, the language of the jury charge in the 2009 punishment hearing is different from the language of the jury charge at punishment in the 1989 trial. The trial court's punishment charge at the 1989 trial contained the three special issues required by Texas law at the time: the deliberateness, future dangerousness, and provocation special issues. In response to the United States Supreme Court's decision in *Penry v. Lynaugh*,[13] which had been decided approximately four months before appellant's 1989 trial, the trial court also submitted a supplemental jury instruction, which instructed the jury to negatively answer any one of the three special issues if it found sufficient mitigating circumstances to warrant a sentence less than death when deliberating "on the questions posed in the special issues."[14]

---

[13]  492 U.S. 302 (1989) ("*Penry I*").

[14]  The supplemental instruction stated:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability when answering the issue under consideration. If you determine, when giving effect to the mitigating

(continued...)

The jury charge at the 2009 punishment hearing included both the deliberateness and future dangerousness special issues. It did not include the provocation special issue. Also, rather than a supplemental instruction, the jury charge contained a third special issue, the mitigation special issue, that asked:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

While the language of the 1989 supplemental instruction is undeniably different from the language of the 2009 mitigation special issue, the purpose of each instruction was the same: to instruct the jury to consider mitigating evidence that might cause the jury to determine that a life sentence would be a more appropriate sentence than death. The parties, issues, and underlying purpose of the jury charge were the same in both 1989 and 2009. Further, defense counsel in 1989 and 2009 had the similar motive of presenting mitigating evidence to the jury. That appellant is now dissatisfied with the depth of prior counsel's cross-examination of DeAnda does not affect that motive. *See Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994) (citing *United States v. Salerno*, 505 U.S. 317, 329 (1992) (Stevens, J., dissenting) (noting that having a similar motive and opportunity but not actually

---

[14](...continued)
evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to that special issue under consideration.

acting on it does not render former testimony inadmissible)); *see also United States v. Salerno*, 505 U.S. at 326 (Blackmun, J., concurring) (pointing out that "similar motive" does not mean "identical motive"). Therefore, the trial court did not violate appellant's Sixth Amendment right to confront and cross-examine a witness by admitting DeAnda's former testimony. Point of error five is overruled.

"10/12 RULE"

In point of error six, appellant alleges that the "10/12 rule" violates the Eighth Amendment of the United States Constitution. He argues that the trial court failed to instruct jurors that a vote by one of them would result in a life sentence despite the statutory requirements of ten votes for a "no" response to the question of future dangerousness, or for a "yes" response to a finding of a mitigating circumstance. Appellant asserts that the "10/12 rule" unduly pressures jurors to change their votes to reach a result. This Court has consistently upheld the "10/12 rule" as constitutional. *Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999); *McFarland v. State*, 928 S.W.2d 482, 519 (Tex. Crim. App. 1996); *Lawton v. State*, 913 S.W.2d 542, 558-59 (Tex. Crim. App. 1995). Appellant has given us no reason to revisit this issue. Point of error six is overruled.

CONSTITUTIONALITY OF ARTICLE 37.0711[15]

---

[15] Appellant refers to Article 37.0721 in his brief. However, there is no Article 37.0721 in the Texas Code of Criminal Procedure. We presume appellant intends to refer to Article 37.0711.

In his seventh point of error, appellant complains that the capital murder sentencing statute is unconstitutional because it allows the jury to determine future dangerousness based solely on the facts of the case. This Court has consistently held that the jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995); *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986). This Court has also consistently held that the circumstances of the offense itself, if severe enough, may be sufficient to support an affirmative finding to the future dangerousness special issue. *Hunter v. State*, 243 S.W.3d 664, 672-73 (Tex. Crim. App. 2007); *Barley v. State*, 906 S.W.2d 27, 30 (Tex. Crim. App. 1995); *Barnes v. State*, 876 S.W.2d 316, 322 (Tex. Crim. App. 1994); *Keeton*, 724 S.W.2d at 61. Appellant's arguments do not persuade us to reconsider our prior decisions upholding the constitutionality of the Texas death penalty scheme. Point of error seven is overruled.

We affirm the judgment of the trial court.


DELIVERED DECEMBER 15, 2010

PUBLISH