**AFFIRM; and Opinion Filed December 19, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-18-00020-CR
No. 05-18-00021-CR
No. 05-18-00022-CR

**JACK ANTHONY CHATMAN JR., Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F17-20589-V,**
**F17-20590-V, & F17-52715-V**

## MEMORANDUM OPINION

Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Fillmore

A jury found Jack Anthony Chatman, Jr. guilty of aggravated robbery, aggravated assault with a deadly weapon, and evading arrest/detention with a previous conviction.[1] The jury assessed punishment at fifteen years' confinement for the aggravated robbery conviction, ten years' confinement for the aggravated assault with a deadly weapon conviction, and two years' confinement for the evading arrest/detention conviction. In three issues in Case Nos. 05-18-00020-CR and 05-18-00021-CR, Chatman contends the trial court erred by admitting into evidence a

---

[1] Chatman was charged by indictment with, and found guilty of, aggravated robbery of Brandon Greer in Case No. 05-18-00020-CR. Chatman was charged by indictment with aggravated robbery, and was found guilty of the lesser-included offense of aggravated assault with a deadly weapon, of Adriana Woods in Case No. 05-18-00021-CR. Chatman was charged by indictment with, and found guilty of, evading arrest/detention with a previous conviction in Case No. 05-18-00022-CR.

recording of a 911 call and home video surveillance footage, and by failing to limit the definitions of intentionally and knowingly in the jury charge to the relevant conduct elements for aggravated robbery. In one issue in Case No. 05-18-00022-CR, Chatman contends the evidence is insufficient to prove he was lawfully detained at the time he fled from police officers.

We affirm the trial court's judgments.

## BACKGROUND

*Woods's Testimony*

On the morning of October 17, 2016, Brandon Greer, his girlfriend, Adriana Woods, and her children were at their apartment sleeping. Woods testified someone rang the doorbell and Greer "rolled over to answer the doorbell on his phone." Woods got out of bed when she heard "a lot of stuff moving around in [the] living room," and found Greer fighting with a black male wearing a yellow vest "that people wear when they work at night." At trial, Woods identified Chatman as the man in the yellow vest. Woods initially thought Greer and Chatman were fighting because they knew each other. She looked out the front door, saw two other black males, and asked for their help. According to Woods, they ran into the apartment and one of them punched her in the face, fracturing her nose. When she looked up, "there was a gun in [her] face," and Woods realized Chatman was not "just fighting with [Greer]." The gun pointed in her face was silver. The intruders demanded "money and a safe." On her knees, Woods responded that she did not have any money. Woods testified she believed the intruders were going to kill her.

As one of the intruders attempted to lock the front door, Vita Greer, Brandon's mother,[2] entered the apartment whereupon he hit her on the head with a handgun and she fell to the floor. Woods testified the intruder who hit her in the face grabbed and had his arm around her daughter.

---

[2] Because Brandon and Vita share the same surname, we refer to Brandon as "Greer" and Vita as "Vita" in this opinion. Greer's mother lived in the same apartment complex.

According to Woods, Chatman dropped a gun onto the floor and Chatman "[told] his friend, 'Get the gun'."[3] Woods testified, "when all the commotion was going on, I got up and I ran. I just picked up my little girl and I got my son . . . and got in the closet" and called 911. Over Chatman's objection, a recording of Woods's 911 call was introduced into evidence and played for the jury. Woods testified she heard gunshots while she was calling 911. Woods remained in the closet with her children until the police arrived. She did not know the intruders. Woods described the intruders, their clothing, and the events she witnessed to the 911 operator and the police. According to Woods, the intruders stole Greer's mobile phone and Vita's car keys.

*Greer's Testimony*

Greer testified he was asleep on the morning of October 17, 2016, when the doorbell rang and he received a notification on his phone that someone was at his front door. He answered his phone and saw "a guy in a yellow vest."[4] At trial, Greer identified Chatman as the intruder in the yellow vest who "robbed [him] that day." Greer answered the door and Chatman asked if "Bozworth stay here?" Greer testified that after he responded no, "the next thing you know, he say, 'Drop out, bitch ass n*****,' and pulled a pistol out on [him] in [his] face." Greer tried to slam the door shut, but Chatman fought to keep the door open. Greer slipped and fell to the ground, and Chatman entered the apartment. Chatman pointed the gun at Greer as they fought their way into the kitchen. Greer knocked the gun out of Chatman's hand and it slid onto the living room floor. Woods ran into the living room and tried to break up the fight.

According to Greer, two other intruders ran into the apartment, and one of them punched Woods in the nose, pointed a gun in her face, and demanded to know the location of money and a safe. At Chatman's instruction, the second intruder looked for Chatman's gun while holding

---

[3] Woods did not actually see the second gun. She testified that when Chatman said, "Get the gun," the intruder holding the silver gun handed it to the third intruder and then proceeded to look for Chatman's gun.

[4] Greer's home video surveillance system included a camera at the front door that recorded images that could be viewed on his cell phone.

Greer's daughter. When the second intruder continued to ask Greer where the money was, Greer responded "what money?" whereupon the intruder punched Greer in the face and hit him on the head with a pistol. Greer testified he believed the intruders were going to kill him.

Vita entered the apartment, and an intruder hit her on the head with a pistol.[5] Vita was screaming, and the intruder told her, "Shut up, b****. Shut up." Vita's husband, Terry, ran into the apartment and threw the third intruder out of the apartment; at that point, the third intruder ran. Terry grabbed one of the two remaining intruders. Greer testified that Terry and Chatman fought outside the apartment while Chatman was yelling, "Pop that n*****, P." The second intruder repeatedly hit Greer on the head with his pistol. Chatman "started shooting." Greer testified Chatman "was right in front of [Greer] shooting at [Terry] right in front of the door."

The events occurring outside the front door were captured on Greer's home video surveillance system. The camera at the front door was motion activated. Video images captured when the camera was activated were stored in a password-protected "personal file" in the "cloud." Greer could view the videos by accessing an "app" on his mobile phone. Over Chatman's objection, three video clips recorded on Greer's surveillance system were admitted into evidence and played for the jury. The jury heard Greer describe the events recorded on the video clips. The first video clip showed Chatman standing outside the front door in a yellow workman's vest, holding a clipboard with papers attached. The second clip showed Chatman and other intruders fighting Terry, and an intruder holding a handgun. Greer testified he saw two handguns used during the offense. Continuous screaming can be heard in the background. In the third clip, Vita can be heard screaming and the intruders are gone. Greer did not know the intruders.

---

[5] Greer testified he "[couldn't] see at this moment" because they were on the other side of the apartment.

*Officer Pride's Testimony*

On March 3, 2017, Dallas Police Department Officer Jamal Pride was in uniform and on patrol duty, looking for robbery suspects. Officer Pride testified,

> The area's known to be a high-crime area. A lot of shootings happen there. A lot of robberies happen there. They have multiple dope houses . . . in the area. Multiple drug houses in the area. So they try to keep a lot of officers in the area just to keep the crime rate down.

Because three robberies had occurred in the area recently, Officer Pride was on assignment waiting for other officers to arrive to "see if [they could] ask the citizens and get some information about who's been committing the robberies in the area." The description of the suspects provided to the officers "was three black males going around the neighborhood robbing people."

Officer Pride was wearing a body camera. Video images recorded by the body camera were played for the jury. Officer Pride testified he and his partner saw three black males walking down the street and "[walked] over to have a consensual encounter with them." According to Officer Pride, his partner

> [m]ight have asked them about the robberies that was going on. They said they didn't know nothing about it. Then we asked them for their names. They start giving us their name[s] and I go to my computer and run them, and one of them came back with [an] aggravated robbery warrant.

The arrest warrant was for Chatman, who had "volunteer[ed] his name when he was asked for it." Because Chatman did not have identification with him, Officer Pride returned to his computer to verify whether the tattoos on Chatman's forearms matched the identifying tattoos described in the warrant. After verifying that Chatman's tattoos matched the description, Officer Chatman again returned to his computer to check a database that stored photographs and other information on individuals who had been arrested. He found Chatman's photograph, confirming the arrest warrant was for "the same person [he was] encountering."

After verifying Chatman's identity, Officer Pride and another officer "pulled [Chatman] over to the side," told him to put his hands "up on the hood" for a pat down, and then told him to put his hands behind his back. "[A]t that point he [took] off running." A chase ensued and Chatman was captured and arrested. All of the officers at the scene were uniformed and driving marked Dallas Police Department vehicles.

The jury convicted Chatman of aggravated robbery, aggravated assault, and evading arrest with a prior conviction.

## ANALYSIS

### Cause Nos. 05-18-00020-CR and 05-18-00021-CR

### *Issue 1:  Admission of the Recorded 911 Call*

In his first issue relating to Case Nos. 05-18-00020-CR and 05-18-00021-CR, Chatman contends the trial court erred by admitting into evidence, over his hearsay objection, a recording of Woods's 911 call, and argues the recording "should have been played for the [trial] court prior to a ruling on its admissibility." In response, the State avers Chatman's objection was a "shotgun objection," which did not preserve the issue for review; and, in any event, the recording of the 911 call was admissible as a present sense impression or an excited utterance. The State argues it was not necessary for the trial court to listen to the recording prior to ruling on its admissibility because Woods had already testified she believed Chatman and the co-defendants were going to kill her, called 911 for emergency help, related information to the 911 operator about the events "that she had on her mind at the time," was "frantic" and "afraid," described the men who broke into her apartment and "what [she] had just experienced," informed the 911 operator that the men had a gun, and provided her address to the 911 operator.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion if "its determination lies outside the zone of reasonable disagreement." *Id.*

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Generally, hearsay statements are inadmissible at trial. TEX. R. EVID. 802. An exception exists for statements that are present sense impressions. TEX. R. EVID. 803(1). A present sense impression is a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." *Id.* The underlying rationale for this exception is that "contemporaneity of the statement with the event that it describes eliminates all danger of faulty memory and virtually all danger of insincerity." *Fischer v. State*, 252 S.W.3d 375, 380 (Tex. Crim. App. 2008).

Here, the evidence shows Woods related to the 911 operator the events immediately preceding her 911 call and the events contemporaneously transpiring in the apartment. Woods testified the voice on the recording reporting the offense was hers, the recording was a fair and accurate depiction of the 911 call she made regarding the offense, and she did not believe there were any changes, alterations, or deletions to the recording. In the call, Woods told the 911 operator there were "three dudes," "they're breaking in my house," "they have a gun," "they're shooting," "one of them punched me in the face," she was hiding in the closet and did not know "who these people are," and "all they was (sic) asking for was money." Woods stated the men were "all black," and described the clothing each of the three men was wearing. Woods can be heard crying during portions of the call. Woods contemporaneously told the 911 operator when the men left, and that "they took the key to [Vita's] car." Because Woods described and explained the events as they were happening, and as she was hearing and perceiving them, the trial court could have reasonably determined her statements in the recorded 911 call fell within the hearsay

exception of present sense impression. *See Reyes v. State*, 314 S.W.3d 74, 78 (Tex. App.—San Antonio 2010, no pet.). Further, on this record, Woods's testimony, as referenced above, provided ample evidence to support a finding by the trial court that the recording of the 911 call contained Woods's present sense impressions of the events transpiring in the apartment.

Consequently, we conclude the trial court did not abuse its discretion in admitting the recorded 911 call. *Id.* We resolve Chatman's first issue relating to Case Nos. 05-18-00020-CR and 05-18-00021-CR against him.

### Issue 2: Admission of the Videotape

In his second issue relating to Case Nos. 05-18-00020-CR and 05-18-00021-CR, Chatman contends the trial court erred in admitting into evidence home video surveillance footage that was not authenticated and was unreliable because it did not capture all of the relevant events and therefore was incomplete. In response, the State avers Chatman's objection at trial was a "shotgun objection," which did not preserve the issue for review; and, in any event, the video was admissible because Greer was an eyewitness to the offense; owned the surveillance system that recorded the video footage; and testified he had reviewed the footage and it fairly and accurately depicted the events that occurred at his home. The State further responds a detective observed the video footage at the scene on the day of the robbery.

We review a trial court's ruling on authentication issues for an abuse of discretion. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). A trial court has considerable latitude with regard to evidentiary rulings, and we will uphold a trial court's admissibility decision that falls within the zone of reasonable disagreement. *Id.*

To properly authenticate an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it to be. TEX. R. EVID.

901(a). Texas Rule of Evidence 901 further provides, by way of illustration and not by way of

limitation, the following examples of means of authentication:

> (1) Testimony of witness with knowledge. Testimony that an item is what it is claimed to be.
>
> . . . .
>
> (2) Distinctive Characteristics and the Like. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

TEX. R. EVID. 901(b). This rule governs the admissibility of video recordings. *See Fowler*, 544

S.W.3d at 848–49. Conclusive proof of authenticity is not required before allowing admission of

disputed evidence. *Id.* at 848. Rule 901 merely requires evidence sufficient to support a finding

that the evidence in question is what the proponent claims. *Id.* "[T]he most common way to

authenticate a video is through the testimony of a witness with personal knowledge who observed

the scene." *Id.* at 849.

Here, prior to admitting the video recording into evidence, the trial court asked the State to

make an offer of proof. The State indicated the camera recorded video and audio, and:

> [Greer would] testify as to this being his home surveillance system . . . [and] doorbell camera that recorded incidents or pieces of this offense. In particular, he's going to say that [it] . . . capture[d] the image of the defendant outside of his apartment while he's knocking on the door.
>
> And then another clip is going to be of the fight that occurred out in the breezeway, right outside the door[.]
>
> And then the third clip is going to be of the aftermath. After everybody has left and the witnesses also can be seen in that clip . . . coming back to the apartment, and his mom sort of screaming in the background.

Chatman objected to admission of the video footage under Texas Rule of Evidence 901 on the

grounds:

> [T]his video footage comes from ring.com, or it comes from a dot com of some sort.

And in reviewing the discovery, what happened is the CW said, Here you are, law enforcement, and was able to log into a cloud and then retrieved some videos and then e-mailed them to law enforcement.

Some of my concerns, number one, is that we've got three separate kind of recordings that were turned over to me. And it's not a full, like, I don't even know what I'm missing. But under optional completion obviously there's portions that are missing . . . and I don't believe that law enforcement ever had access to the actual account to actually download the information themselves.

. . . .

[I]t's my understanding that there was no system that it was ever recorded to. Let alone, does this witness have the ability to talk about how this even works? That, I believe that this would be beyond his expertise.

. . . .

[I]t would limit our cross-examination as it relates to maybe making some challenges about this device and whether or not it should be considered a credible device because we don't have someone who can speak intelligently about the ins and outs of the actual mechanism. So we have an issue as relates to my client's constitutional right to cross-examine because we will not fully be able to cross-examine this witness about the mechanism.

We don't think that he is the proper authority to actually authenticate it.

. . . .

[W]e do feel like it would only be cumulative.

And we're going to throw in prejudicial versus probative.

Chatman later added, "At no point in time, unless the State can correct me, did law enforcement, themselves, access the data to make sure that it was all being turned over."

In response, the State indicated that Greer knew how the video surveillance system worked and could describe proper operation of the system and provide context concerning the video recording, and explained that the video was not cumulative because it would provide the jury a "visual of what actually happened." The trial court overruled Chatman's objections and granted him a running objection.

–10–

Greer testified his apartment was equipped with a motion activated "Ring Video Doorbell" home video surveillance system. A functioning camera at the front door was linked to his cellphone through an "app." Greer explained how the Ring Video Doorbell camera system worked:

> [I]t detects motion and it records whatever motion that it detects for a certain amount of time. And then once that motion is – once that person is gone, it shuts off.

Greer receives a phone notification whenever the Ring Video Doorbell camera is activated, and activation occurs not only when the doorbell is rung, but also if a person "walk[s] straight up to it." Then, Greer could "answer it," "not answer it," talk to the person, or decline the call. He could also "zoom in, zoom out. . . . move the lens right or left, up and down." The camera records "clips," meaning it begins recording when the motion sensors are activated and stops recording when the sensors do not detect motion. The video clips are automatically stored in a "personal cloud" that is password protected.

Greer described the events depicted in the video clips and testified the camera at his front door captured three clips of the offense that occurred outside the apartment, he recognized the people and voices on the video clips, the video clips accurately depicted the events occurring outside the apartment on the day of the offense, and he believed viewing the video clips would help the jury understand his testimony. In this case, Greer was a witness with "personal knowledge who observed the scene," and the State properly authenticated the video footage through Greer's testimony. *See Fowler*, 544 S.W.3d at 849. We resolve Chatman's second issue relating to Case Nos. 05-18-00020-CR and 05-18-00021-CR against him.

### Issue 3: Jury Charge Error

In his third issue relating to Case Nos. 05-18-00020-CR and 05-18-00021-CR, Chatman contends the trial court erred by failing to limit the definitions of intentionally and knowingly in

the jury charge to the relevant conduct elements for aggravated robbery. We review a claim of jury charge error in two steps. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). First, we determine whether error exists in the charge. *Id.* Second, if there is error, we review the record to determine whether the error caused sufficient harm to require reversal. *Id.* The degree of harm necessary for reversal depends upon whether the error was preserved in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). If, as in this case, error was not preserved, the error requires reversal only if it was "so egregious and created such harm that the defendant did not have a fair and impartial trial." *Marshall*, 479 S.W.3d at 843; *see also Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

"Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *State v. Ambrose*, 487 S.W.3d 587, 597 (Tex. Crim. App. 2016) (quoting *Marshall*, 479 S.W.3d at 843). In conducting an egregious-harm analysis, we consider the entire jury charge, the state of the evidence, the closing arguments of the parties, and any other relevant information in the record. *Arteaga v. State*, 521 S.W.3d 329, 338 (Tex. Crim. App. 2017). We must "review the relevant portions of the *entire* record to determine whether [a defendant] suffered actual harm, as opposed to theoretical harm, as a result of the error." *Ambrose*, 487 S.W.3d at 598.

One or more of three conduct elements may be involved in an offense: (1) the nature of the conduct, (2) the result of the conduct, and (3) the circumstances surrounding the conduct. *Price*, 457 S.W.3d at 441; *Cook v. State*, 884 S.W.2d 485, 487 (Tex. Crim. App. 1994) (internal citations omitted). The culpable mental state definitions in the charge must be tailored to the conduct elements of the offense. *See Cook*, 884 S.W.2d at 487–88; *see also Price*, 457 S.W.3d at

441. Aggravated robbery contains all three conduct elements. *See Ash v. State*, 930 S.W.2d 192, 195 (Tex. App.—Dallas 1996, no pet.). Causing bodily injury or fear of bodily injury is a result-of-conduct element; unlawful appropriation is a nature-of-conduct element; and causing injury or fear of injury to occur in the course of committing a theft is a circumstances-surrounding-conduct element. *Id.*

With respect to his conviction for aggravated robbery, Chatman contends the trial court failed to properly limit the mental state definitions of "intentionally" and "knowingly" in the jury charge to their applicable conduct elements. Chatman argues he was egregiously harmed by the error because the charge authorized a conviction for "making a threat," rather than for the "result of a threat," lowering the State's burden of proof as to the culpable mental state. The State concedes the trial court failed to properly limit the mental state definitions, but argues Chatman was not egregiously harmed by the error.

Even assuming the jury charge failed to properly limit the mental state definitions of "intentionally" and "knowingly," we cannot conclude Chatman has established he was egregiously harmed by the error. As charged in this case, a person commits aggravated robbery if, in the course of committing theft of property and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places a person in fear of imminent bodily injury or death and uses or exhibits a deadly weapon in the course of the offense. *See* TEX. PENAL CODE ANN. §§ 29.02(a)(2), 29.03(a)(2). The evidence at trial showed Chatman and two other intruders conducted a home invasion, demanding money and the location of a safe, and stole a cell phone and car keys. The intruders punched Woods in the face, fracturing her nose, pointed a handgun in Woods's face, hit Vita on the head with a handgun, fought with Greer, hit Greer on the head with a handgun, and fired shots. Given the evidence presented at trial, it is highly unlikely that the failure to limit the mental state definitions in the jury charge caused Chatman actual harm. *See*

–13–

*Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015) (mandating that, in considering state of evidence, we "determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm").

In considering the closing arguments of the parties, "we look to whether any statements made by the State, appellant, or the court during the trial exacerbated or ameliorated error in the charge." *Id.* at 844. Chatman's counsel argued there was "[no] testimony from any codefendant that [said] . . . when we went in, the intent was specifically to rob," and that "[w]ithout you knowing the intent, for all we know, based on the evidence that the State has presented, there was a beef going on of some sort and the intent was to fight in some manner." Chatman's counsel subsequently repeated this argument, stating, "It's a personal beef. It's a personal beef. This was about fighting." The State responded that Chatman and the two other intruders entered the apartment to steal money and a safe. Neither the State nor the defense focused on the mental states set out in the jury charge.

As to any other relevant information in the record, there is nothing that reflects that the jury was so confused by the complained-of instruction that Chatman was denied a fair and impartial trial.

Based on our examination of the entire record, we conclude Chatman was not egregiously harmed as a result of the trial court's failure to limit the definitions of the culpable mental states to the conduct elements of aggravated robbery. We resolve Chatman's third issue in Case No. 05-18-00020-CR against him.

With respect to his conviction for aggravated assault against Woods, Chatman argues he was charged by indictment with "aggravated robbery," and the trial court erred by not limiting the culpable mental states required for each of the "three conduct elements [that] are involved in aggravated robbery offenses," *i.e.*, (1) the nature of the conduct, (2) the result of the conduct, and

(3) the circumstances surrounding the conduct, in the jury charge. Chatman avers the jury charge did not properly "limit the culpable mental states to their relevant conduct elements," and "[did] not describe the manner and means Chatman used to commit the robbery . . . ."

Chatman, however, was not convicted of aggravated robbery of Woods and has failed to provide any substantive analysis regarding how any error by the trial court in failing to limit the definitions of the mental states in the jury charge on the aggravated assault charge caused him egregious harm. By failing to provide any argument or authority with respect to the jury charge on the aggravated assault charge, Chatman has waived any error due to inadequate briefing. *See* TEX. R. APP. P. 33.1(h); *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005). We resolve Chatman's third issue in Case No. 05-18-00021-CR against him.

### Case No. 05-18-00022-CR

### *Issue 1: Sufficiency of the Evidence*

In his sole issue relating to Case No. 05-18-00022-CR, Chatman contends the evidence is insufficient to prove Officer Pride was attempting to lawfully detain Chatman at the time he fled.

In determining whether the evidence is sufficient to support a conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018). Under this standard, the trier of fact has the responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Zuniga*, 551 S.W.3d at 732. Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). If the record supports conflicting inferences, we

–15–

presume the fact finder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Zuniga*, 551 S.W.3d at 733. The fact finder is the exclusive judge of credibility and weight to be attached to the testimony of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *See Zuniga*, 551 S.W.3d at 733; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Zuniga*, 551 S.W.3d at 73. On appeal, the same standard of review is used for circumstantial and direct evidence cases. *Hooper*, 214 S.W.3d at 13.

The statute governing the offense of evading arrest or detention provides "[a] person commits an offense if he intentionally flees from a person he knows is a peace officer . . . attempting lawfully to arrest or detain him." TEX. PENAL CODE ANN. § 38.04(a). Chatman contends the State did not lawfully detain him. The jury, however, heard testimony that Officer Pride and his partner saw three black males, including Chatman, walked up to them, and asked if they could talk to them. Officer Pride's partner asked if the three individuals knew anything about the recent robberies, and they replied they did not. During the conversation, the officers asked for the names of the individuals, which they voluntarily provided. The testimony indicates Officer Pride merely spoke to Chatman and did not display a weapon, physically touch Chatman, or act in a threatening manner. At no time did Chatman tell Officer Pride he wanted to leave. Officer Pride attempted to arrest Chatman only after Chatman voluntarily provided his identification, Officer Pride checked his computer and learned there was an outstanding warrant for Chatman's arrest, Officer Pride asked Chatman to roll up his sleeves—which Chatman did voluntarily—to confirm whether the tattoos on Chatman's forearms matched the description in the warrant, and Officer Pride verified on his computer that Chatman had an arrest record with a matching photograph,

–16–

confirming Chatman's identity.  When Officer Pride attempted to execute an arrest warrant, Chatman fled.

As the sole trier of fact and credibility of the witnesses, the jury was free to believe or disbelieve Officer Pride's testimony.  *See Temple*, 390 S.W.3d at 360.  After considering all the evidence in the light most favorable to the verdict, based on the evidence and reasonable inferences therefrom, we conclude a rational jury could find Officer Pride was executing an arrest warrant when Chatman fled.  We resolve Chatman's sole issue in Case No. 05-18 00022-CR against him.

We affirm the trial court's judgments.

/Robert M. Fillmore/

ROBERT M. FILLMORE
JUSTICE

Do Not Publish
Tex. R. APP. P. 47

180020F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JACK ANTHONY CHATMAN JR.,
Appellant

No. 05-18-00020-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F17-20589-V.
Opinion delivered by Justice Fillmore,
Justices Lang and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of December, 2018.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JACK ANTHONY CHATMAN JR.,
Appellant

No. 05-18-00021-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F17-20590-V.
Opinion delivered by Justice Fillmore,
Justices Lang and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of December, 2018.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JACK ANTHONY CHATMAN JR.,
Appellant

No. 05-18-00022-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F17-52715-V.
Opinion delivered by Justice Fillmore,
Justices Lang and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of December, 2018.