**Affirmed and Memorandum Opinion filed May 24, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-16-00908-CR

---

**JEREMY JERMAINE SANFORD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 15CR0523**

---

## M E M O R A N D U M   O P I N I O N

Jeremy Jermaine Sanford appeals his conviction for aggravated robbery. *See* Tex. Penal Code Ann. § 29.03(a) (Vernon 2011). Appellant contends that the trial court abused its discretion and committed harmful error by admitting "victim injury photos" over his objection. Because we conclude that any alleged error in the admission of this evidence was harmless, we affirm.

## BACKGROUND

Appellant was indicted for aggravated robbery, and a jury trial was held from September 19, 2016, until September 23, 2016. At trial, the 84-year old complainant,[1] Jose Porras, testified that he and his wife, Linda Porras,[2] lived in a house on Cobb Street in Texas City. Linda had cancer and was bedridden, and complainant cared for her. On the morning of February 27, 2015, complainant was making breakfast for Linda when he heard the doorbell ring and someone "hitting the door." Complainant testified that Linda told him, "Don't answer the door. It don't sound good." He decided to open the door.

Complainant testified that he "barely opened the door," when a black man kicked the door open and said, "I have a gun." Complainant tripped over the coffee table and the man started hitting him with a gun he held in his hand and demanded money. When complainant told the man he had no money, the man continued hitting complainant on the head, in the face, and on the mouth. Complainant could not remember how long the man was hitting him; complainant tried to keep the man away from Linda so he would not hurt her.

While the man continued hitting complainant, Linda crawled out of the back of the house through the back door to a neighbor's house to call for help. The 9-1-1 call was played for the jury. Linda told the dispatcher that a thin black man was in their house threatening complainant with a gun and telling complainant, "I'm going to kill you, give me money." In response to the dispatch, several police officers arrived at complainant's house and set up a perimeter.

In the meantime, the man continued demanding money, beating complainant,

---

[1] Complainant was 82 years old at the time of the aggravated robbery on February 27, 2015.

[2] Linda died before trial commenced.

2

and telling him, "I'm going to kill you, old man." Complainant testified that the man asked, "Where's the safe? Where is the money?" The man and complainant then went to the master bedroom where the man removed a white pillowcase from a pillow and started putting jewelry and other items into the pillowcase. Complainant testified that he could not see what exactly the man was putting into the pillowcase because he "had a lot of blood on [his] face."

The man again demanded money. In an effort to get the man out of the house, complainant told the man that there was money in his truck. But the man did not want to leave without complainant. The man put a gun in complainant's back and said, "Let's go out there and get it." When complainant walked out the front door with the man behind him, "the police [were] all over the place." Complainant testified that the man "saw the police, [and] he ran back through the house and went out the back door." Complainant testified that the police told him, "'Come here. Come here,' and [he] went straight to the police and they put [complainant] behind one of the cars" and told him to wait there because an ambulance was on the way. Complainant was taken to the hospital when the ambulance arrived.

Complainant testified that he did not know at the time he "was all messed up." He testified that he lost a tooth when the man hit him in the head. He also had three large wounds on his head; one "hole" was so large that it could not be stitched up but required several staples. He stated that his mouth was "all messed up," and his lip was cut and required several stitches. Complainant also sustained injuries to his eyes because the man hit him so hard. His vision is still blurry in one eye; he already had one eye surgery and will require more surgery. Complainant also sustained injuries to his arm and wrist from the beating.

Over appellant's objection, the trial court allowed the State to admit State's exhibits 6 through 21. These exhibits are photos showing appellant in the hospital

after the attack. The State discussed only exhibits 6 through 8, 11 through 16, and 18. The photos show injuries complainant sustained to his head, lip, arm, and left eye.

The jury also heard the testimony of Texas City Police Officers Brad Macik, Ralf Cardona, Thomas Robinson, Jeremy Reynolds, and Jeff Baugh. They testified that they responded on the morning of February 27, 2015, to a dispatch report that a man had broken into a home and was holding one of the homeowners at gunpoint. About eight police officers arrived at complainant's house; set up a perimeter for containment, with four officers at the back and four officers at the front of the house; and observed complainant's house.

Officer Cardona testified that he was at the back of the house, securing the house so no one could leave. While observing the house and surroundings, he heard a male's muffled scream or yell from inside the house. Several minutes passed before one of the police officers "advised everybody he had somebody coming out of the front of the house." Immediately thereafter, Officer Cardona saw a black male with a stocking over his head exiting the back door of the house. The man was carrying a white pillowcase that was covered with blood. When the man saw police officers, he quickly ran back into the house, dropped the pillowcase, and ran out the front door. Officer Cardona remained at the back of the house to secure the scene while other police officers chased after the man. Officer Cardona identified appellant in the courtroom as the person who fled the house and was apprehended by police officers.

Officer Cardona testified that he and other police officers walked through the house after appellant was apprehended to make sure there was no one else inside. The officers confirmed that no other person was in the house besides appellant and complainant. Officer Cardona stated that during the walk-through he observed a

4

"tremendous amount of blood spatter" throughout the house; "[t]here were smears of blood everywhere;" the "house was just in chaos;" "[s]tuff was turned over everywhere, broken;" and "[c]lothes were everywhere." Officer Cardona also stated that he "view[ed] firsthand — the blood, the way the house was just in disarray. There was blood everywhere. We were trying not to step on it, and it was impossible not to do. There was a lot of blood, a lot of blood."

The jury viewed the video recorded on Officer Cardona's body camera, which confirmed his testimony and showed that appellant tried to leave through the rear door of the house, went back into the house, and fled through the front door of the house. This sequence of events occurred about 10 minutes into the video recording. The video also showed the house in complete disarray.

Officer Macik testified that he was one of the police officers who set up perimeter at the back of complainant's house. He could hear "noises coming from the residence" but could not determine "if it was screaming or yelling." After several minutes passed, an "officer at the front of the residence advised they had somebody exiting the front." As Officer Macik transitioned from the back to the front of the house, another officer advised that a man was leaving through the back door. Officer Macik turned around to go toward the back of the house but the man fled through the front door. A foot pursuit ensued until police officers apprehended the man. Officer Macik identified appellant in court as the man who was apprehended after fleeing complainant's house.

The jury viewed Officer Macik's in-car video recording, which showed appellant fleeing the scene, being pursued by several police officers until he was apprehended, and police officers carrying appellant away. This sequence of events occurred about 12 minutes into the video recording. Officer Macik also testified that he walked through complainant's house to "clear" it and found the house to be in

5

"complete disarray" and there was "quite a bit of blood" throughout the house.

Officer Robinson testified that he arrived at complainant's house and joined other police officers at the scene. He testified that he was wearing a body camera at the scene, and the video recording was played for the jury. The video showed (1) a man tried to run out complainant's house through the back door carrying a white pillowcase; (2) when the man saw police officers, he ran back into the house; (3) the man fled through the front door; (4) several police officers chased after him as he ran over vacant lots and to another house; (5) the man fell down but got up again and continued to run; (6) as he tried to jump over a fence, the man's jacket sleeve got caught in the fence and he fell; (7) police officers handcuffed him; (8) the man did not respond to any of the police officers' questions or commands, and did not want to cooperate; (9) police officers carried the man and placed him into the back seat of a police car; (10) the man had a black stocking over his head; and (11) police officers recovered a gun in the grass next to where the man was apprehended.

Officer Robinson testified that the video accurately depicts what happened at the scene. He identified appellant in court as the man who was apprehended by police. He testified that he saw appellant was holding a handgun while he was fleeing. Officer Robinson observed appellant throwing the handgun he was holding over the fence. Officer Robinson also observed one round of ammunition in appellant's gun.

Officer Reynolds testified that he was dispatched to complainant's house. When he arrived, other police officers already were at the scene. Several minutes after he arrived at the scene, Officer Reynolds observed an elderly Hispanic man, who "was covered in blood" and appeared to be injured, walking out the front door. Shortly after the elderly man came out, another man wearing a stocking over his head exited complainant's house and fled on foot. Officer Reynolds assisted in

6

apprehending the man. Officer Reynolds identified appellant in court as the man police apprehended.

Officer Baugh testified that he arrived at complainant's house around 7:00 a.m. At some point, he observed complainant exit the house. Officer Baugh gave the following description of complainant: "He looked gravely injured. He was bleeding profusely from his head. There was actually so much blood, I couldn't tell where exactly he was bleeding from. So he was staggering, stumbling. His head was down. His shoulders were dropped. I was just doing my best to try to focus on him to make sure he could get to me."

Officer Baugh used his police-issued tablet to videotape complainant after he came out of his house. The video, admitted as State's exhibit 425A, was played for the jury and showed complainant's head covered in blood, blood dripping down complainant's face, complainant's white shirt covered in blood, and complainant's grey pants with numerous blood stains. The video showed complainant telling the officer that only one man came into the house, hit him with a gun, and demanded money from a safe. Complainant stated that he told the man he had no safe and no money and the man hit him many more times in the head.

Officer Baugh testified that, after recording complainant's statements, complainant was taken by ambulance to the hospital. Officer Baugh then took a statement from Linda, who had been at her neighbor's house. Linda did not appear to be physically injured but "she was visibly shaken" and "she was upset." Linda gave Officer Baugh consent to search the house, so he and Officer Larry Crow "did [a] walk-through of the residence" and recorded two videos of the walk-through. The two videos were played for the jury and showed complainant's house in disarray. There were blood drops and blood smears throughout the house, including on the floors of the bedrooms, bathrooms, dining room, and kitchen; on furniture;

7

on bed sheets; and other miscellaneous items. There were drawers turned over; things were strewn around; and a white bloody pillowcase filled with items was laying on the kitchen floor close to the back door.

Officer Larry Crow, who was part of the crime scene unit and in charge of collecting evidence, testified that he arrived at complainant's house after appellant had been taken into custody. Officer Crow testified that he saw complainant, who had "head injuries and was bleeding pretty bad," and decided to take photos of complainant before the ambulance arrived. The State introduced two photos, State's exhibits 22 and 23, into evidence, which showed complainant's head covered in blood, blood running down complainant's face, and complainant standing in his bloody clothes with bare and bloody feet.

Officer Crow took over fifty more photos of the crime scene that were introduced into evidence. The photos showed complainant's house in chaos with blood drops and blood smears throughout the house. According to Officer Crow, there appeared to have been a struggle in the house and the house was in disarray. Some of the photos showed a trail of blood droplets starting at the front door of the house to the drive way and across the road where complainant was walking after leaving his house after the attack to meet the police officers. Photos also showed the gun appellant had thrown in the grass during his flight from police. The gun was bloody and was loaded with one round. There were several photos showing the items that were recovered from inside the bloody pillowcase appellant had dropped in the kitchen before fleeing. The pillowcase contained jewelry, watches, coins, and other items.

Forensic scientist Jessica Ehmann testified that she analyzed several items she was given by the police, including the bloody gun and the pants and jacket appellant wore during complainant's attack. With regard to appellant's pants, she testified that

"[t]he DNA profile from this item is interpreted as originating from a single individual. Obtaining this profile is 396 quadrillion times more likely if the DNA came from [complainant] than if the DNA came from an unrelated, unknown individual. Based on the likelihood ratio result, [complainant] cannot be excluded as a possible contributor to the profile."

With regard to appellant's jacket, Ehmann testified that "[t]he DNA profile from this item is interpreted as a mixture of two individuals. Obtaining this mixture profile is 1.57 quintillion times more likely if the DNA came from [complainant] and one unknown individual, than if the DNA came from two unrelated, unknown individuals. Based on the likelihood ratio result, [complainant] cannot be excluded as a possible contributor to the profile." And regarding the frame of appellant's gun, Ehmann testified that "[t]he DNA profile from this item is interpreted as originating from a single individual. Obtaining this profile is 383 quadrillion times more likely if the DNA came from [complainant] than if the DNA came from an unrelated, unknown individual. Based on the likelihood ratio result, [complainant] cannot be excluded as a possible contributor to the profile."

Appellant also testified at trial. He stated that he lived with his father on the same street as complainant — about 200 yards away. He testified that he knew complainant and his wife and had spent the night there once when complainant's grandson snuck him in the house. Appellant stated that he "was going through a situation" and did not remember much about the incident. Appellant claimed that he only remembers being at his house with his girlfriend in the early morning hours of February 27, 2015, and that he had two shots of liquor and smoked marijuana. He claimed that "the next minute" he remembers after that was being in Texas City jail.

He testified that he did not remember going to complainant's house "at all." When his trial counsel asked if he remembered "seeing the horrible pictures that we

saw of [complainant] bleeding out of his head and all over the place," appellant acknowledged seeing the photos the State introduced but stated that he did not remember hitting complainant. He also testified he did not remember holding a pillowcase with items, or fleeing complainant's house. Appellant testified that he believed his girlfriend unintentionally may have "slipped something in [his] marijuana because she has a bad habit of doing drugs." Appellant stated, "I really honestly feel like that wasn't me that did it at all."

On cross-examination, appellant admitted being convicted in June 2013 of a misdemeanor offense for evading arrest; in April 2014 of a felony offense for evading arrest; and in November 2014 "of assault causing bodily injury on a family member." Appellant also acknowledged that the evidence at trial showed that he put a stocking over his face, went to complainant's house with a loaded gun, and knocked on complainant's door. He claimed he did not "knowingly" force his way inside complainant's house, beat complainant, and then flee because he did not remember doing any of these things. Appellant stated, "I don't believe it was me who did it. If the evidence point and conclude that it was me, then, well, it should be me; but to my conclusion, I don't believe I did it . . . I don't remember doing anything at all. So I can't tell you if I did or I didn't do it."

The jury found appellant guilty of aggravated robbery and assessed his punishment at sixty years' confinement. Appellant filed a timely notice of appeal.

## ANALYSIS

Appellant argues that the trial court abused its discretion by admitting — during the guilt-innocence phase of trial — "victim injury photos over objection when the photos were gruesome and the probative value nominal." Appellant argues that the trial court's "error was not harmless because the jury imposed a sentence 55 years longer than the possible minimum," even though appellant had "only one

10

single felony conviction for evading arrest on his record, and despite the victim making a full recovery." According to appellant, the jury's "harsh sentence was undoubtedly influenced by the experience of seeing those photographs."

We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). We will not conclude that the trial court abused its discretion unless its decision lies outside the zone of reasonable disagreement. *Id*. Moreover, we must disregard non-constitutional errors that do not affect the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Rene v. State*, 376 S.W.3d 302, 305 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). We will conclude that the erroneous admission of evidence did not affect an appellant's substantial rights and was thus harmless error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect upon the jury's verdict. *See Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000).

In conducting a harm analysis and evaluating whether the jury was adversely affected by evidence that was erroneously admitted, we consider everything in the record, including the other evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, the way in which the erroneously admitted evidence might be considered in connection with other evidence in the case, the theories of the defense and the prosecution, the arguments of counsel, and the extent to which the State emphasized the alleged error. *Rene*, 376 S.W.3d at 305-06.

Here, appellant argues that the trial court erred by admitting State's exhibits 6 to 21 into evidence over appellant's objection. These exhibits were photos

11

showing appellant in the hospital after the attack. The photos depict the injuries complainant sustained to his head, lip, arm, and eyes. Complainant was mostly cleaned up and only some blood was still showing on his face and head. Most of the photos were of complainant's face and head showing cuts as well as injuries to his head that required several staples and stitches to treat. One photo was of the bloody cut inside of his lower lip; a few photos showed a close-up of his red and swollen eyes.

Appellant argues that these photos are gruesome, "cumulative and bolstering of the victim's testimony" and had only nominal probative value. Assuming, without deciding, that the trial court abused its discretion in admitting the photos, we conclude that the alleged error was harmless.

The exhibits are photos depicting complainant's injuries after he was treated at the hospital with most of the blood cleaned off his head and face but still showing wounds stapled and stitched as well as cuts with spots of crusted blood. The State discussed only exhibits 6 through 8, 11 through 16, and 18; and the photos were discussed only briefly. Fewer than two pages in the record were dedicated to discussing the complained-of exhibits; the State did not mention the photos afterwards. *See Leyba v. State*, 416 S.W.3d 563, 570 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (holding error in admission of evidence was harmless because the evidence was only briefly presented and was not emphasized).

Additionally, State's exhibits 6 to 21 are far less graphic than other evidence that was admitted at trial. The trial court also admitted State's exhibit 22, over objection, and State's exhibit 23, without objection, into evidence. State's exhibit 23 is a photo taken by Officer Crow of complainant after the attack. It depicts complainant standing by a police car; complainant's head covered in blood; blood running down complainant's face; complainant's white shirt covered in blood;

12

complainant's grey pants with numerous blood stains; and complainant's bare feet covered in blood. State's exhibit 22 is a close-up photo of State exhibit 23.

The trial court also admitted State's exhibit 425A without objection, which is a video showing how complainant looked immediately after the attack. The video captures complainant standing next to a police car, visibly shaken, waiting for the ambulance to arrive; his head covered in blood; blood dripping down his face; his white shirt covered in blood; his grey pants having numerous blood stains; and his bare feet bloody.

Any error in the admission of complained-of evidence is harmless in light of the admission, without objection, of similar evidence. *See Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (stating that improper admission of evidence was harmless "in light of the proper admission into evidence of very similar" evidence); *Rene*, 376 S.W.3d at 307 (concluding that "any error was harmless in light of the admission, without objection, of similar evidence"). Here, the trial court admitted, without objection, arguably more disturbing and emotionally charged evidence than the evidence appellant challenges on appeal.

Further, the jury saw numerous photos and two video recordings of the crime scene showing the chaos appellant created during the attack along with a trail of blood throughout complainant's house. The jury heard complainant's first-hand description of the brutality of the attack. The jury heard complainant describe the physical effects of the attack, including his inability to do many things he was earlier able to do as well as the need for more surgery. There also was overwhelming evidence of appellant's guilt; appellant does not challenge the sufficiency of the evidence on appeal.

The jury heard testimony from complainant's daughter, Belinda Porras, at the punishment phase regarding how substantial complainant's injuries were and how

13

the attack affected him psychologically and physically. She testified that complainant had to stay in the hospital for one week and then she had to stay with him for two more weeks to take care of him. According to Belinda, complainant could not see "because of the beating;" he suffered serious injuries to his eye and requires more surgery; he could not eat, stand, or sleep; he had bad nightmares; and he thought he was going to die. Belinda testified that complainant started having nightmares again after testifying at the guilt-innocence phase of trial. Complainant told Belinda, "I can hear that boy. 'I'm going to kill you, old man.'"

Considering the substantial amount of physical and testimonial evidence presented at trial, the challenged photos comprise an insignificant portion of that evidence in the context of the entire case against appellant. *See Kirk v. State*, 421 S.W.3d 772, 784 (Tex. App.—Fort Worth 2014, pet. ref'd).

Appellant contends that the jury's assessment of his punishment at 60 years' confinement was "harsh" and shows the jury was "influenced by the experience of seeing those photographs." But the jury assessed 39 years less than the maximum sentence allowed for the crime. Additionally, the jury heard appellant's testimony during the punishment phase and could assess the presence of any remorse for the attack on an elderly complainant. Although appellant apologized to complainant and his family, he stated, "I am still firm that I am — I was not knowingly, intending to hurt anyone on that day; and I do apologize for everything I have brought upon their family. I am very, very sorry in my heart; and I never intended to hurt anyone . . . I did not know what I was doing at the time."

Finally, the jury heard that appellant was sent to lockdown four times since he was put in jail for this crime. And appellant admitted having six prior convictions, which included burglary of a vehicle, misdemeanor evading arrest, misdemeanor "assault causing bodily injury of a family member," misdemeanor theft, another

misdemeanor evading arrest, and felony evading arrest.

After examining the entire record, we have fair assurance that, even if the trial court erred by admitting the complained-of photos, the alleged error did not have a substantial and injurious effect or influence on the jury. *See* Tex. R. App. P. 44.2(b). Accordingly, we overrule appellant's sole issue.

## CONCLUSION

We affirm the judgment of the trial court.

/s/    William Boyce
       Justices

Panel consist of Justices Boyce, Jamison and Brown.

Do Not Publish — Tex. R. App. P. 47.2(b).