

# NUMBER 13-17-00084-CR

# COURT OF APPEALS

# THIRTEEN DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**FERNANDO MARTINEZ BALLADARES,**                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                      **Appellee.**

---

**On appeal from the 139th District Court
of Hidalgo County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Rodriguez**

Appellant Fernando Martinez Balladares challenges his conviction for aggravated sexual assault. *See* TEX. PENAL CODE ANN. § 22.021(2)(B) (West, Westlaw through 2017 1st C.S.). By two issues, Balladares argues that the evidence is legally insufficient to support his conviction, and that because Texas criminal law no longer affords him the

ability to challenge the factual sufficiency of the evidence, he is deprived of his due process right to meaningful review of his conviction.   We affirm.

## I.   BACKGROUND

In 2015, Balladares was indicted for continuous sexual abuse of a child, a felony of the first degree.   *See id.* § 21.02(h) (West, Westlaw through 2017 1st C.S.).   The case was tried before a Hidalgo County jury in 2017.

### A.   L.M.'s Testimony[1]

L.M. recalled that she was eight years old when Balladares, her stepfather, began abusing her.   According to L.M., during the most recent instance of abuse, Balladares touched her private part with his hands, under her clothing, causing her pain.   L.M. testified that the abuse occurred in the living room of her house while her mother A.M. was shopping, and her brothers were in another room.   L.M. explained that she told Balladares to stop, but he did not stop until A.M. returned home.

That evening, L.M. told A.M. what happened, at which point A.M. got into a fight with Balladares, and Balladares began choking her.   L.M. testified that she fled the house with A.M. and went to a friend's house, where A.M. checked L.M. for injuries and found blood in her underwear.   L.M. further testified, in detail, about previous incidents of sexual abuse in which Balladares inserted his sexual organ into hers, touched her breasts, and abused her in other ways.

L.M. explained that she then disclosed the abuse to her aunt, to an employee at her elementary school, and to Eric Galvan, who was an investigator for Child Protective

---

[1] We use aliases to protect the minor's identity.   *See* TEX. R. APP. P. 9.8 cmt.

Services (CPS). However, L.M. recanted her allegations during a May 3, 2013 interview at the Children's Advocacy Center (CAC). According to L.M., she lied when she recanted her allegations because her mother instructed her to do so and instilled her with fear that if she told the truth about the abuse, CPS would take her and her siblings away from their mother.

**B.    Other Witnesses**

Galvan testified that he became aware of L.M. when she reported to an elementary school teacher that she had been abused by Balladares. L.M. was nine years old at the time. Galvan contacted L.M. and her family in April of 2013. According to Galvan, L.M. reported that she had told A.M. about the abuse, but A.M. had done nothing to address the situation. Galvan also interviewed Balladares and A.M., who both claimed that L.M. was lying about the abuse. A.M. explained that L.M. lied often.

Galvan testified that he observed an interview with L.M. at the CAC on May 3, 2013. During the interview, L.M. recanted her allegations of abuse and claimed that Balladares had never touched her. L.M. explained that she had lied about the abuse to a teacher because she did not like Balladares and did not want him to be with her mother.

However, L.M. then expressed fear that if she confirmed the abuse, she and her siblings would be taken away by CPS. L.M. began crying and changed course. L.M. explained that the first time Balladares touched her was in a trailer in San Juan, Texas. She explained that Balladares touched her under her clothes "in the middle," sticking his finger inside of her. She told the interviewer that Balladares touched her three other times.

L.M. then asked if she and her siblings would be taken away from her mother or if her mother would be put in jail. When the interviewer did not answer her question, L.M. changed course once more and denied that any abuse had occurred, explaining that she had just lied because she did not like Balladares. L.M. explained that her mother had told her that authorities were "going to put me away because I'm sick in the head."

Based on L.M.'s interview, Galvan believed that someone made L.M. afraid that if she disclosed the abuse, CPS would take her away from her mother or that she would be locked away. However, Galvan testified that because L.M. recanted, CPS could not determine whether Balladares abused L.M. CPS closed its initial investigation.

Separately, police began investigating possible abuse by Balladares. Ruben Pequeno, Jr., a juvenile investigator with the Pharr Police Department, testified that he was assigned to the case on May 2, 2013. Investigator Pequeno explained that after L.M. recanted her allegations, the police department closed the investigation, citing insufficient evidence.

Galvan testified that in June of 2013, CPS reopened its investigation when L.M. again reported abuse. L.M. and her siblings were removed from A.M.'s house. CPS placed the children with relatives and, later, with a foster family.

Sonja Eddleman, a director at a local hospital, testified that she oversaw a sexual assault nurse examiner (SANE) who met with L.M. in June of 2013, shortly after L.M. renewed her allegations of abuse. According to Eddleman, L.M. reported that Balladares spit on his fingers and inserted them inside her sexual organ. As Eddleman read from L.M.'s records, she recounted a quote from L.M.: "I would tell my mom and she would

say yes. My mom would tell me not to tell cause she was sad and scared to start with another person, but I told my grandma anyway." L.M. displayed no genital trauma, but Eddleman testified that this was common of sexual abuse cases, particularly months after the abuse occurred. Eddleman also believed it was common for children to recant allegations of abuse because disclosing abuse can change a child's world drastically. Eddleman confirmed that L.M. had not reported any other forms of sexual abuse aside from the insertion of his fingers during her October 2013 SANE exam, though according to the medical records, Balladares had touched her four times in all. However, the State offered medical records of a second SANE exam conducted in January 2014, during which L.M. described, in graphic detail, multiple instances of abuse by Balladares.

Laura Salazar, a "conservator specialist" with CPS, testified that following L.M.'s removal from A.M.'s home, she oversaw visits between L.M. and A.M. Salazar recalled an incident where L.M. saw A.M. arriving for visitation in Balladares's vehicle. When L.M. saw her driving Balladares's vehicle, she became panicked and upset. From that point on, L.M. would not visit with A.M.

A.M. testified that L.M. had disclosed the abuse over dinner in 2013. According to A.M., L.M. reported that Balladares had inserted his fingers into her. A.M. explained that she began to cry and took all of the children to a friend's house for the night. While there, she checked L.M.'s genitals for signs of bleeding or abuse, but she found none. A.M. testified that she came up with the plan whereby L.M. would disclose the abuse to her elementary school teacher the following day. A.M. denied that L.M. had cut off contact with her because she was still in a relationship with Balladares.

5

Sofia Arizpe, the attorney ad litem for L.M. and her siblings, testified that in September of 2013 she asked the Pharr police department to reopen the investigation because the "details that were provided by the child to CPS were too descriptive to not pay attention to them." According to Arizpe, it is common for children to recant allegations against family members due to feelings of guilt, and she believed that L.M. had recanted because she felt responsible for her siblings being put into foster care.

Investigator Pequeno explained that after receiving Arizpe's request, Pharr police began to compile evidence once more, including an affidavit in which L.M. renewed her allegations against Balladares. Investigator Pequeno reviewed the recording of L.M.'s interview at the CAC. In Investigator Pequeno's view, L.M. had been coached, and she recanted her allegations out of fear that CPS would take her away from her mother.

Investigator Pequeno testified that he next contacted A.M., who confirmed that L.M. "had told [her] what had happened." A.M. explained to Investigator Pequeno that after she learned of the abuse, she confronted Balladares, and Balladares beat her. Investigator Pequeno then contacted L.M.'s younger brother, E.M., who confirmed that he had seen Balladares touching L.M.'s private parts on one occasion. Based on this evidence, Investigator Pequeno pursued and obtained a warrant for Balladares's arrest in November of 2013.

## C. Conclusion of Trial

At the conclusion of the evidence, the jury found Balladares guilty of the lesser included offense of aggravated sexual assault of a child. *See id.* § 22.021. The trial court pronounced punishment at eighteen years' confinement. Balladares appeals.

## II. LEGAL SUFFICIENCY

By his first issue, Balladares contends that the evidence is legally insufficient to support his conviction.

A person commits the offense of aggravated sexual assault if the person intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means and the victim is younger than fourteen years of age. *Id.* § 22.021(1)(B)(i) & (2)(B). In assessing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). We give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.* "Under this standard, evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

Balladares argues that the evidence is insufficient to show that he assaulted L.M. because of inconsistencies in the trial evidence and L.M.'s recantation. However, the jury could have believed L.M.'s explanation that she was coached into recanting her

allegations by her mother—testimony that was corroborated by witnesses who reviewed video of the interview, including the CPS investigator Galvan and Investigator Pequeno. *See Jenkins*, 493 S.W.3d at 599.   The jury could have assigned greater weight to:

- L.M.'s graphic description of the manner and setting in which Balladares abused her;

- Her brother E.M.'s confirmation that he witnessed a sexual assault;

- A.M.'s admission that she engaged in a violent confrontation with Balladares after hearing of the abuse, as well as L.M.'s testimony that her mother and aunt discovered blood in her underwear that evening;

- Similar reports of abuse in the days and weeks after L.M. disclosed the abuse, which were heard by A.M., the SANE, Galvan, and possibly others;

- The testimony by Laura Salazar that, months after the alleged abuse, L.M. was panicked by even the sight of Balladares's vehicle;

- The testimony that L.M. no longer had contact with her mother due to A.M.'s continuing relationship with Balladares.

*See id.*   The cumulative force of this incriminating evidence would enable a rational juror to find the essential elements of the offense of aggravated assault beyond a reasonable doubt.   *See* TEX. PENAL CODE ANN. § 22.021; *Jenkins*, 493 S.W.3d at 599.   Accordingly, we conclude the evidence is legally sufficient to support Balladares's conviction.   *See Jenkins*, 493 S.W.3d at 599.

We overrule Balladares's first issue.

8

### III. VIOLATION OF DUE PROCESS

By his second issue, Balladares protests the Texas Court of Criminal Appeals' decision to do away with factual sufficiency review. Balladares contends that without factual sufficiency review, his due process rights are violated because there is no meaningful review of his case.

The Texas Court of Criminal Appeals has directed intermediate courts to apply the *Jackson v. Virginia*[2] standard of review to all sufficiency challenges in criminal cases. *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010) (plurality op.); *see Martinez v. State,* 327 S.W.3d 727, 730 (Tex. Crim. App. 2010) (adopting the *Brooks* plurality as a unanimous majority view). As our state's final voice on the meaning of the Due Process Clause in criminal cases, the Texas Court of Criminal Appeals was not unaware of that clause when it issued its rulings in *Brooks* and *Martinez*. We therefore presume that our state's highest criminal court has satisfied itself that a single standard of review does justice under the Due Process Clause.

This Court has previously rejected a similar invitation to second-guess *Brooks* on the basis that it violated the Texas Constitution. *See Perez v. State*, No. 13-11-00060-CR, 2013 WL 6055252, at *3 (Tex. App.—Corpus Christi Nov. 14, 2013, pet. ref'd) (mem. op., not designated for publication). We wrote, simply, "We decline appellant's invitation; 'we are duty bound to follow precedent issued by the Texas Court of Criminal Appeals in this matter.'" *Id.* (quoting *Kiffe v. State*, 361 S.W.3d 104, 109 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd)). We repeat those sentiments today.

---

[2] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

9

We overrule Balladares's second issue.

### IV.   CONCLUSION

We affirm the judgment of conviction.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
30th day of August, 2018.