**Affirmed and Opinion Filed February 16, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00882-CR**

**SIM STANLEY BITTICK, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 15th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 071896**

## MEMORANDUM OPINION

Before Justices Molberg, Carlyle, and Smith
Opinion by Justice Molberg

Appellant Sim Bittick was indicted for continuous sexual abuse of a child younger than fourteen and nine counts of aggravated sexual assault of a child. A jury found Bittick guilty of continuous sexual abuse and eight of the counts of aggravated sexual assault, and the trial court sentenced him to ninety-eight years' confinement for each offense. In this appeal, Bittick argues the trial court abused its discretion in overruling his rule 403 objections and admitting extraneous evidence showing he (1) sexually assaulted his daughter and (2) solicited the murder of

witnesses in this case. We affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## Background

T.W., who was twenty-six years old at trial, testified Bittick was her stepfather. She grew up being cared for by him and her mother, Tammy, until she was fourteen or fifteen, when Bittick and Tammy divorced. With Tammy's permission, T.W. married and moved in with Jimmy Robertson when she was sixteen. T.W. told Robertson that Bittick and Tammy sexually abused her when she was younger, and she decided to report the abuse to the police. She said Robertson was the first person she told about the abuse because, for the first time, she was no longer living with Bittick or Tammy and she was "no longer in that house." T.W. had not reported the abuse previously because she was scared of Bittick and Tammy, who repeatedly told her that "what goes on in this house, stays in this house." She was also scared that if she said anything, she would have to live "with strangers who could do worse things," because that is what Bittick and Tammy told her would happen. Tammy explained to T.W. that she had to participate in these sex acts "to help save her marriage," so that Bittick would not leave. When she was younger, T.W. did not realize this conduct was wrong, but by the time she was twelve, she realized the conduct was wrong and abnormal.

T.W. testified her first memory of abuse was when she was about eight years old. Tammy brought her into the master bedroom, asked her to undress, and directed

her to perform oral sex on Bittick. T.W. said this happened almost every night afterwards and that it occurred on at least a weekly basis. The abuse was not limited to oral sex. T.W. said Bittick put his fingers on and inside her vagina, and that Bittick and Tammy used vibrators both on and inside T.W.'s vagina. T.W. said Bittick's penis was never erect, and he never ejaculated.

T.W. testified the sexual abuse usually happened in Bittick and Tammy's bedroom, but not always. She said she remembered one occasion when Bittick woke her up in the middle of the night, brought her into the living room, and sat her on his lap. He "had porn playing on the TV and he would have me touch him, and he would touch me." Bittick rubbed her vagina with his fingers and also inserted them inside her vagina. T.W. said Bittick was wearing a lady's nightgown, which he did regularly, but his penis was exposed, and Bittick had her rub it with her hands.

On another occasion, T.W. said Bittick and Tammy were watching T.W. use a vibrator on herself in the living room when her grandmother came to the front door. They told T.W. to run upstairs to her bedroom with the vibrator to hide.

T.W. said sometimes Bittick had her insert a strap-on dildo in Bittick's anus. Bittick and Tammy had a variety of dildos of different sizes, she testified, but they only used the smaller ones on her. They also had a collection of pornography, including magazines and DVDs, that they kept in the dresser in their bedroom and on top of the dryer in the bathroom. Bittick and Tammy sometimes had T.W. watch

pornography, which was "a lot of like stepfamily type stories and like lesbian type stuff."

T.W. said Bittick sometimes read T.W. erotic stories he found online. After reading her stories, he had T.W. get on the bed where he used his fingers to touch her vagina and inserted his fingers into her vagina. Bittick had T.W. rub his penis and put her mouth on his penis.

T.W. testified sometimes she was alone with Bittick, and sometimes she was alone with Tammy, but the occasions of abuse when she was alone with Bittick were more numerous.

T.W. said in August 2005, when she was about nine-and-a-half, she remembered Bittick causing the penetration of her vagina with a sex toy. In the same time period, she remembered Bittick penetrating her mouth with his penis. Near her tenth birthday, around January 2006, Bittick penetrated her vagina with his finger. Around March 2006, just after T.W.'s birthday, she remembered Bittick penetrating her vagina with a vibrator and putting his penis in her mouth. She recalled Bittick putting his penis in her mouth in June 2006. T.W. also said that, when she was eleven-and-a-half, around September 2007, Bittick touched her genitals and caused her to contact his anus with a sex toy.

T.W. said these sorts of incidents of sexual abuse happened on a regular basis—"every night almost" or multiple times a week—from the time she was

around eight until she was twelve. She said "normally on the nights that it didn't occur" she was with her grandparents.

T.W. said she was no longer sexually abused once she was enrolled in elementary school following being homeschooled. She said the abuse ceased when she asked Bittick and Tammy to stop, after she "started to realize that it wasn't normal."

On cross-examination, T.W. reiterated she did not talk to anybody about the sexual abuse because she was told not to. T.W. acknowledged she did not tell a series of doctors or, after she started school in fifth grade, her teachers, about the abuse, and had told one doctor that she had not engaged in any sexual activity. Defense counsel questioned her, noting that if the abuse occurred daily for four years, that would be about 1,200 instances of abuse, and T.W. said that, yes, she was telling the jury it happened about 1,200 times.

Defense counsel also questioned T.W. about her mental health history and asked her how much time she spent in treatment. T.W. said she did not know if she was at Texoma Care in 2011, and she said when she was about fourteen years old she went to Glen Oaks twice and was released in April of 2010. T.W. said she went to Glen Oaks because she deliberately overdosed. She believed her mental problems were a result of the years of sexual abuse she endured. After she realized the abuse was wrong, she experienced tremendous mental anguish and was still dealing with

it at trial time. T.W. said she did not tell anybody who could have helped her that she thought the abuse was the cause of her mental health problems.

Tammy, who was represented by counsel and had been charged with five counts of aggravated sexual assault of a child, testified after being admonished about her Fifth Amendment rights. She said she and Bittick broke up because she was trying to get T.W. away from him "because I knew that he was molesting her." Tammy acknowledged she participated in the molestation.

Tammy said she was scared of Bittick because he had threatened to shoot her parents if she did not do as he said. Tammy said the first instance of abuse was when Bittick wanted T.W. to kiss his penis, and so Tammy gave T.W. directions to do just that; she said Bittick's penis contacted the inside of T.W.'s mouth and her lips. She said this happened on a number of occasions. Tammy said that while she observed Bittick use vibrators on T.W., she did not think he inserted them into her vagina. She said on other occasions Bittick had T.W. use a strap-on to penetrate his anus. The first time, T.W. started crying, and Tammy said she told her to leave and go to bed. Bittick had T.W. try again just a couple more times because Tammy said T.W. "wouldn't tolerate it."

Tammy said Bittick sometimes asked her to touch T.W., so she touched T.W.'s legs and rubbed the outside of her vagina. She said T.W. was naked on these occasions. Bittick wore shorts so loose his penis was exposed, and he frequently wore women's clothing, including nightgowns, capri pants, and bras.

Tammy said that prior to the start of the period when T.W. was molested, she and Bittick did not have sex toys. After they started molesting T.W., they got a couple of vibrators and a small dildo. Tammy said pornography was sometimes part of the sexual abuse of T.W. Bittick would watch pornographic videos knowing T.W. would see, and he left pornographic books or magazines around the house for T.W. to find.

Tammy said during these incidents of sexual abuse, she was typically watching or sitting next to them, and sometimes she was naked as well.

Tammy said she participated because she was trying to protect her family, and she was financially dependent on Bittick. She was afraid of Bittick, but there was also a selfish element to her participation. After every instance of abuse, Tammy said she and Bittick told T.W., "[W]hat goes on in our house, stays in our house." Tammy said they drilled this into T.W.'s head because they were scared T.W. would tell someone and they would get caught.

Tammy testified Bittick's job as a truck driver allowed him to be home almost every night. Around the time T.W. was eight, when she started homeschooling, Tammy said the abuse was not frequent, but a couple of times a month or more, though there were times it was twice a week. The abuse continued until T.W., eleven or twelve at the time, told Tammy she wanted it to stop, though Tammy also said she "was tired of it" and said she thought the abuse would have stopped around that time regardless.

Tammy said T.W. did not have many friends over to their house while growing up because she and Bittick were afraid T.W. would tell someone about the abuse. She said when T.W. was younger, T.W. had no idea what they were doing was wrong, but by the time she was eleven or twelve, she began to realize it was wrong. Tammy said that leading up to that time, T.W. began exhibiting behavioral problems and seemed to be depressed.

Tammy said she was willing to incriminate herself in front of the jury because she "wanted to make things right, or try and make things right" and give T.W. some peace.

On cross-examination, Tammy said she had bipolar disorder and depression and was taking medication for these conditions. She said despite working for a trucking company at one point, Bittick was not gone for long periods but only a day or two at a time. Tammy said it was possible T.W. walked in on Bittick and Tammy attempting to have sex or Tammy wearing the strap-on.

Tammy said her parents lived next door and that her father was a "tough guy" who would take care of anything that affected her. She said she never told her father that Bittick was threatening her because she was trying to protect her parents. Nor did she tell her brother or Denison police. Tammy said the abuse did not happen more than a thousand times, but twenty or twenty-five times. After she and Bittick broke up, Tammy said she sometimes approached Bittick for help with money.

Tammy testified she met with prosecutors three or four times for one to two hours to prepare for her testimony.

Tammy said she started using methamphetamine around 2015, she became addicted, and used it for about four years. Tammy rejected defense counsel's contention that she suggested Bittick bring T.W. into their sexual relationship and that Bittick rejected her proposal.

Tammy testified she allowed fourteen-year-old T.W. to have a relationship with a nineteen-year-old male before she realized how old he was. Tammy said she herself later had a relationship with the same individual, and that T.W. "may have" resented the fact that she was dating him. Tammy said she approved T.W.'s marriage to Robertson, who was twenty-nine, because she was "trying to get [T.W.] away from [Bittick]" and also because T.W. "deserved some happiness." However, she also said T.W. married Robertson after she and Bittick broke up. Tammy said Bittick and Robertson did not get along and Bittick did not approve of him marrying T.W. She said Bittick made a physical threat towards Robertson shortly before Robertson and T.W. went to the Denison police to report the sexual abuse.

Tammy testified she spoke with Denison police in 2012 or 2013. She told them Bittick was a good provider and T.W. was not comfortable around Bittick because he was very strict. She said she told the police she neither observed Bittick molest T.W. nor abused T.W. herself, and that T.W. had never made an outcry of abuse. Tammy said she lied to the police.

Tammy also told the police T.W. was prescribed Depakote for depression when she was ten and a psychiatrist referred her to a specialty care center, Glen Oaks, where she spent a week for treatment for suicidal ideation. T.W. also went to her primary care doctor numerous times over the years but never made an outcry of abuse.

Tammy rejected counsel's suggestion she was "snitching" to get a break in her own criminal cases but said, instead, she was telling the truth. She said she did not know whether she was helping herself by testifying.

Detective Steven Mackay testified he followed up on the allegations against Bittick in 2020. Mackay said he searched Bittick's work truck and found pornographic DVDs, "a bra with gel inserts . . . that a male could wear," an anal plug, and "female underwear in a size a male could wear."

The trial court conducted a hearing outside the presence of the jury on the admissibility of evidence relating to Bittick's sexual abuse of M.C., his daughter. M.C. testified that on numerous occasions in 1993 and 1994, when she was a little older than three years old, Bittick made her touch his penis. She said she usually undressed and laid down beside him, and he would make her touch his penis. M.C. said that at first these instances of abuse were infrequent, but over time, it "became multiple times weekly." M.C. said there were also times she would "have to lay on top of him" while naked; on such occasions his penis was in contact with her body.

–10–

She said his penis was never erect and there was no penetration, but he would rub his flaccid penis on M.C.'s body.

M.C. said she was rewarded for "keeping my mouth shut" by being allowed to take apart Bittick's stereo. She did not think anything was wrong at the time because Bittick was her father. But she said Bittick also told her she would be taken by child protective services if she told anyone about his conduct.

When M.C. was four or five years old, Bittick began penetrating her vagina with his fingers and objects. Once, she said, Bittick inserted a miniature bat into her anus and caused bleeding that would not stop, and she had to be taken to the hospital. M.C. said it was her recollection a report was made to the police and that Bittick was arrested. Shortly afterwards, M.C.'s grandparents moved her out of state.

Bittick objected to M.C.'s testimony on the basis of rule 403, noting that the allegations went back to the early 1990s, and asked for a running objection to her testimony before the jury. The trial court overruled Bittick's objection, stating that "in light of the questioning of prior witnesses that basically the defense is that the victim in this case made it up or is fabricating the story, I think that makes this relevant."

M.C. testified before the jury to the same facts described above. During her testimony, the trial court instructed the jury as follows:

> Evidence of a crime, wrong, or other act other than what somebody is on trial for, is not admissible to prove a person's character in order to show that a particular -- that on a particular occasion the person acted

–11–

in accordance with that character. It may be admissible, however, for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. And again, y'all will get this instruction again. But anything dealing with this which is an act not alleged in this case, those are the only purposes you can use it for. You can't use it to prove a person's character in order to show that on a particular occasion a person acted in accordance with that character.

On cross-examination, M.C. said she refreshed her recollection by watching a video recording of a child protective services interview she did in 1995. She said that, prior to watching the video, she would have only said Bittick penetrated her with his fingers, but after watching it, she remembered Bittick used a bat, which she had described in the interview simply as a stick. M.C. described the process of watching the interview of her younger self as "unlock[ing] everything that I have put inside a box that just came up black whenever I would think about it." M.C. said her grandmother told her the allegations were "all in her head."

Sergeant Jessey Grissom testified that Bennie Gonzales, Bittick's cellmate in the Grayson County jail, wanted to speak with the police. Based on his conversation with Gonzales, Grissom conducted an investigation for solicitation of murder that ended up focusing on Bittick, and jail personnel placed a recording device in the cell Bittick shared with Gonzales and other inmates. Grissom also said Gonzales provided him notes listing persons Bittick wanted Gonzales to kill. After reviewing the jail recordings and interviewing Gonzales, Grissom believed he had a case against Bittick for solicitation of capital murder of T.W., Tammy, and Robertson.

–12–

Lisa Beall testified she was in a relationship with Bittick for about ten years until his arrest for these offenses. She said they did not have sex together but used sex toys, including dildos. Beall said Bittick wore women's clothing, including underwear and dresses. After Bittick was arrested, Beall said she sometimes spoke with him over the phone, and a recording of one of their calls was admitted during her testimony, without objection, as State's Exhibit 17. Beall testified that in one call Bittick told her someone called Birdie was going to "take care of Tammy and her family," which she took to mean they would be killed. In State's Exhibit 17, Bittick can be heard to hand the phone to someone who introduces himself as Birdie who tells Beall they might be meeting within the next month.

Bennie Gonzales, also known as Birdie, testified he was currently in prison serving an eight-year sentence for assault and engaging in organized criminal activity. He said he was in Grayson County jail in July and August of 2020, when Bittick tried to hire him to kill T.W., her boyfriend, and "anybody in the way." Over Bittick's reiterated rule 403 objection, Gonzales testified he and Bittick figured out Gonzales's wife was Tammy's cousin and Bittick thought Gonzales would be able to get close to her. Gonzales said that at first he did not agree to the killing, but he changed his mind when he saw Bittick "wasn't going to quit until he got something done" because "he didn't want them to make it to court." Gonzales said that in addition to having this connection to one of the targets, he thought Bittick sought him out because Bittick believed he was "a bad criminal" involved in organized

–13–

crime. He said Bittick talked about it "all day every day." In exchange for the killings, Gonzales was to receive from Bittick a trailer house and some land.

Gonzales testified he spoke with Beall on the phone to make sure she knew that if he got out and carried out his end of Bittick's bargain, he would "be able to stay there without any problem." He also said that at the time of that conversation, he had already alerted the sheriff's office about Bittick's proposal.

Two jail cell recordings were also admitted through Gonzales's testimony. In the first, Gonzales can be heard telling Bittick he "would kill her" if he got out. Gonzales asked Bittick repeatedly if he was sure, and Bittick responded, "yes" and "I'm 100 percent." Gonzales said Bittick could not tell anybody, and Bittick responded, "I don't even know who you are." At one point, Gonzales stated, "Once I kill her, there's no turning back, bro." Bittick responded, "I'll be indebted to you for the rest of my life." Bittick said there would not be any remorse on his part and that Gonzales did not have anything to worry about. Bittick told Gonzales the full names of T.W. and Robertson, and he described T.W. as "the main thing" and Robertson as "the outcry." Bittick told Gonzales that none of T.W.'s allegations were true. Gonzales asked Bittick who he "should do first," and Bittick said T.W. Bittick said he had a perfect alibi because he was in jail.

In the second recording, Gonzales expressed concern to Bittick about staying on his property, and Bittick responded that he would introduce him to Beall on the phone. Again discussing the proposed killings, Gonzales said that if the State did

–14–

not have any witnesses, they could not get Bittick, and Bittick responded, "Exactly." Gonzales said once the job was done, he would contact Bittick and say something like, "Hey, everything is good already," and Bittick suggested, "The house is coming along great."

On cross-examination, Gonzales acknowledged he was serving eight-year sentences for robbery and injury to a child or elderly person. He said he did not "get a break" off the State's initial plea bargain offer after he reported Bittick; although he said the State's initial offer was ten years, the lowered offer was not made for coming forward with his report. Gonzales said he was not expecting further benefits for his testimony.

The defense called Theodore Meason to testify. He said he was a prisoner serving a life sentence for child molestation but had previously been in Grayson County jail where he shared a cell with Bittick. He said he heard some discussion about Bittick wanting witnesses to disappear, but he regarded it as "bragging" or "talking" and did not think Bittick was serious.

T.W.'s grandfather, James Rogers, testified he lived next door to T.W. and Bittick, and T.W. visited often, but she never told him she was being abused. On cross-examination, he said T.W. never had friends over when she was younger and was shy and withdrawn.

Portions of the deposition of Joe Cortez were also read to the jury. Cortez testified he was a cellmate of Bittick in the Grayson County jail. He said Gonzales

was his cousin. Cortez said he did not take Bittick's talk about witnesses "going away" seriously because, he said, Bittick was not in his right mind but was heartbroken. Cortez said Bittick expressed that he wished he was dead—that he was wishing harm on himself and not anybody else. He said Bittick said he wished his relatives "that are putting this on him would just go away" and that he had not done anything.

The jury charge included, among other things, accomplice witness testimony[1] and jailhouse witness testimony[2] instructions relating to the testimony of Tammy and Gonzales respectively. As to extraneous offenses, the charge read as follows:

> The State has introduced evidence of extraneous crimes or bad acts other than the one charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you, if it does, for the purpose of showing the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, if any. You cannot consider the testimony unless you find and believe beyond a reasonable doubt that the defendant committed these acts, if any, were committed [sic] and then only for the limited purpose indicated above.

In closing, Bittick's counsel argued, among other things, that T.W.'s testimony did not "square up" for the following reasons: her claim she did not realize the sexual abuse was wrong until she was twelve was unreasonable and incredible;

---

[1] TEX. CODE CRIM. PROC. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.").

[2] *Id.* art. 38.075(a) ("A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.").

–16–

that claim was inconsistent with her testimony that Bittick and Tammy told her she would end up with a foster family if she told anyone; there was no physical evidence; her testimony lacked precision about much of what she said, including where she was living at particular times; her claim the abuse happened every night was inconsistent with Tammy's testimony and moreover would have meant 1,200 instances of abuse, which was incredible; T.W. was "significantly medicated" for her mental condition; and T.W. had not told any of her doctors, teachers, or grandparents she was being abused, despite numerous opportunities to do so. Counsel also questioned Tammy's testimony, pointing out she previously denied to the police in 2013 that Bittick abused T.W. and also had a four-year methamphetamine addiction. Counsel argued Tammy was "absolutely wheels off," was possibly "the real bad actor here," and testified as she did to try to get a favorable deal from the State.

The jury found Bittick guilty of continuous sexual abuse of a young child, not guilty of aggravated sexual assault of a child in count two, and guilty of aggravated sexual assault in counts three through ten. This appeal followed.

## Discussion

To reiterate, Bittick argues the trial court abused its discretion by admitting extraneous evidence of (1) M.C.'s allegations of sexual assault, and (2) Gonzales's allegations of solicitation of murder. He specifically argues the trial court erred by

overruling his rule 403 objection to M.C.'s testimony because the bad acts alleged were too remote, occurring decades prior, and too dissimilar to the allegations here.

*Extraneous sexual assault*

Upon the trial of continuous sexual abuse of a young child or aggravated sexual assault of a child—notwithstanding evidentiary rules 404 and 405, and subject to section 2-a of article 38.37 described below—evidence that the defendant has committed a separate offense of, among other offenses, continuous sexual abuse of a young child, indecency with a child, or aggravated sexual assault of a child, may be admitted in the trial for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant. TEX. CODE CRIM. PROC. art. 38.37, § 2. Section 2-a requires the trial court to (1) determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt; and (2) conduct a hearing out of the presence of the jury for that purpose. *Id.* art. 38.37, § 2-a.

Even if evidence of a defendant's extraneous act is relevant under article 38.37, the trial court still must conduct a rule 403 balancing test upon proper objection or request. *Keller v. State*, 604 S.W.3d 214, 228 (Tex. App.—Dallas 2020, pet. ref'd). Rule 403 provides that courts may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting

cumulative evidence. TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997). In a rule 403 analysis, courts must balance (1) the inherent probative force of the evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation, with (2) the proponent's need for the evidence, against (3) any tendency of the evidence to suggest a decision on an improper basis, commonly, an emotional one, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *see also Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012).

We review the trial court's decision to admit evidence, including its rule 403 ruling, under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *see also Burgess v. State*, No. 05-17-00271-CR, 2018 WL 3322886, at *4 (Tex. App.—Dallas July 6, 2018, pet. ref'd) (mem. op., not designated for publication) (stating we reverse a trial court's rule 403 balancing rarely and only after a clear abuse of discretion). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement.

–19–

*Martinez*, 327 S.W.3d at 736. Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to the case, it will not be disturbed. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Here, the probative force and the State's need for the evidence of Bittick's assault of M.C. were substantial and weigh in favor of admission. The defense's theory of the case was fabrication, and T.W.'s credibility was therefore critical to the State's case. *See Burgess*, 2018 WL 3322886, at *4 (concluding probative value and State's need high when, among other things, credibility of complainant was critical). Further, there was no physical evidence to support T.W.'s allegations, and the defense highlighted this, beginning in opening statements when defense counsel stated there was "nothing to corroborate the stories that you may be hearing." Although Tammy corroborated T.W.'s testimony, the defense attacked Tammy's credibility as well. In opening statements, for instance, defense counsel questioned Tammy's motives and emphasized that her story had changed over time. Tammy's testimony was also subject to the corroboration requirements of article 38.14, as the jury was instructed in the charge. Moreover, the extraneous evidence at issue here showed Bittick's sexual interest in young girls in his care and prior sexual abuse of a young girl. *See Caston v. State*, 549 S.W.3d 601, 612 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Because the evidence of prior sexual abuse of children '[is] especially probative of [the defendant's] propensity to sexually assault children,' the Rule 403 balancing test normally will not favor the exclusion of evidence of the

–20–

defendant's prior sexual assaults of children."). M.C.'s testimony described similarities between her abuse and that described by T.W., including the types of sexual acts committed and the fact that Bittick's penis was never erect. *See Dennis v. State*, 178 S.W.3d 172, 180–81 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (concluding similarity of extraneous offense to charged offense made the extraneous evidence relevant to rebut theory of fabrication).

In sum, the extraneous evidence of sexual abuse was highly probative because Bittick was charged in this case for the continuous sexual abuse of his stepdaughter, and the extraneous offense testimony tended to (1) make a fact of consequence more probable and (2) show Bittick's motive, opportunity, and intent to commit other, similar incidents of sexual abuse against a child in his care. *See Wishert v. State*, 654 S.W.3d 317, 333 (Tex. App.—Eastland 2022, pet. ref'd).

On the other hand, we do not think this evidence had a significant tendency to suggest a decision on an improper basis, confuse or distract the jury from the main issues, or be given undue weight by the jury. Evidence of Bittick's sexual abuse of M.C. was no more inflammatory than the charged offense and was presented through fewer details than the charged offense. Additionally, M.C. was the only witness to testify about Bittick's abuse of her. Nothing in the record suggests the jury was not equipped to follow the instructions in the jury charge; indeed, the jury distinguished between charged offenses, finding Bittick not guilty of one count of aggravated sexual assault. Finally, the trial court gave, and the jury charge included, a rule

–21–

404(b) instruction limiting the purposes for which the extraneous conduct could be considered, despite the fact that, as discussed above, it could have been considered for broader purposes under article 38.37. Accordingly, we conclude the trial court did not abuse its discretion in overruling Bittick's rule 403 objection to evidence that he sexually abused M.C. Bittick's first issue is overruled.

*Extraneous solicitation of murder*

Bittick also argues the trial court erred in admitting evidence Bittick solicited the murder of witnesses in this case because the evidence had marginal probative value but "tremendous potential to impress the jury in some irrational, yet indelible, way" or to motivate them to convict Bittick on an improper basis.

Evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith" but it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b). The exceptions listed under rule 404(b), which is a rule of inclusion rather than exclusion, are neither mutually exclusive nor exhaustive. *De La Paz*, 279 S.W.3d at 342–43. The proponent of uncharged misconduct evidence need not fit a given set of facts into one of the exceptions enumerated in rule 404(b), but the proponent must be able to explain "the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." *Id.* Any conduct on the part of a person accused of a crime subsequent to its commission that

–22–

indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged. *State v. Villegas*, 506 S.W.3d 717, 749 (Tex. App.—El Paso 2016), *pet. dism'd, improvidently granted*, 544 S.W.3d 375 (Tex. Crim. App. 2018) (per curiam). Even if relevant evidence is offered for a permissible purpose under rule 404(b), a trial court should exclude it from evidence if the probative value is substantially outweighed by the danger of unfair prejudice. *Dennis v. State*, 178 S.W.3d 172, 180 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Evidence that Bittick solicited the murder of witnesses against him was probative of whether he committed the acts charged in this case because it indicated his consciousness of guilt. *See Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) ("an attempt to tamper with a witness is evidence of 'consciousness of guilt'"); *Villegas*, 506 S.W.3d at 749. As above, the State had a need for this extraneous-offense evidence, given that the complainant's credibility was critical to the State's case, the defense's theory was fabrication, there was no physical evidence to corroborate the complainant's testimony, and the credibility of the only other eyewitness to the charged offense had also been called into question.

Further, nothing in the record suggests this evidence had a significant tendency to suggest a decision on an improper basis, confuse or distract the jury from the main issues, or be given undue weight by the jury. Although the State presented this evidence through three witnesses and three exhibits, it took up a fraction of the

–23–

time spent proving the allegations charged in the cases before us. Consideration of Gonzales's testimony was limited by both the rule 404(b) and jailhouse witness testimony instructions. Evidence showing that Bittick sought the death of his stepdaughter and ex-wife undoubtedly carried emotional weight and the danger of impressing the jury in an indelible way. However, we cannot conclude this danger substantially outweighed the evidence's probative value. Accordingly, we conclude the trial court did not abuse its discretion in overruling Bittick's rule 403 objections and admitting evidence of this extraneous conduct. Bittick's second issue is overruled.

## Conclusion

Having overruled Bittick's two issues, we affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

220882F.U05

Do Not Publish
Tex. R. App. P. 47



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

SIM STANLEY BITTICK,
Appellant

No. 05-22-00882-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the 15th Judicial District Court, Grayson County, Texas
Trial Court Cause No. 071896.
Opinion delivered by Justice Molberg. Justices Carlyle and Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of February, 2024.